*In re* VIOLETTA B., a Minor (Violetta B., a Minor, Respondent-Appellant, v. Joe Ann Stanciel, Petitioner-Appellee).

First District (4th Division)   No. 1—90—2270

Opinion filed March 7, 1991.

522

JOHNSON, J., dissenting.

Patrick T. Murphy and Michael G. Dsida, both of Office of Cook County Public Guardian, of Chicago, for appellant.

Randolph Stone, Public Defender, of Chicago (John T. Kennedy, Assistant Public Defender, of counsel), for appellee Violetta Burgos.

Beermann, Swerdlove, Woloshin & Barezky, of Chicago (Howard A. London, of counsel), for appellee Joe Ann Stanciel.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This appeal concerns the guardianship and custody of the four-year-old respondent, Violetta B., who was placed in a foster home at the age of four months. Following a finding that the child's natural parents were unable to care for her, Gary T. Morgan, the guardianship administrator of the Illinois Department of Children and Family Services (DCFS), was appointed guardian of the child, and she was placed in the foster care of Betty Rodriguez. The respondent's paternal grandmother, Joe Ann Stanciel, filed a petition seeking custody of the respondent when the respondent was two years old. After a dispositional hearing, the trial court vacated the guardianship of the DCFS and appointed Joe Ann Stanciel as the private guardian and custodian of the respondent. The respondent appeals by her attorney and guardian ad litem Patrick T. Murphy on the grounds that the trial court's order was against the manifest weight of the evidence.

Before relating the facts of this cause, it is helpful to set forth the statutory provision which governed the course of the proceedings below. Section 7(b) of the Children and Family Services Act provides as follows:

"In placing a child under this Act, a close relative who comes forward or can be identified and who goes through an immediate preliminary approval by the Department shall be selected as the preferred care provider. The close relative must then agree to and subsequently participate in and be qualified in a complete review by the Department. For the purpose of this sub-

section, 'close relative' shall include a parent, grandparent, uncle, aunt, adult brother and adult sister. It shall be the burden of the Department to justify the child's placement elsewhere." Ill. Rev. Stat. 1989, ch. 23, par. 5007(b).[1]

Violetta B., commonly known as Minnie, was born on December 4, 1986. At that time, both of her parents were awaiting trial on charges that they had murdered Minnie's four-year-old sister. They were subsequently convicted of murder and are currently serving 60-year prison terms. In January of 1987, the DCFS was given temporary custody of Minnie and she was placed with a friend of the natural mother. This placement proved unsuccessful, and at the age of four months Minnie was placed in the foster home of Betty Rodriguez, where she currently resides.

On January 19, 1989, the court entered a finding that Minnie's natural parents were unfit and appointed Gary T. Morgan, the DCFS guardianship administrator, as Minnie's guardian with the right to place her. On February 28, 1989, when Minnie was two years old, the paternal grandmother, Joe Ann Stanciel, filed a petition seeking permanent custody of Minnie. Instead of conducting an immediate hearing on the petition, the trial court ordered the DCFS to begin exploring the possibility of placing Minnie with Stanciel. Several status hearings were conducted over the course of the following 15 months.

Supervised visits between Minnie and Stanciel began in May of 1989, when Minnie was approximately 2½ years old. To assist in their efforts to develop a permanent plan for Minnie, the DCFS contracted with Thomas Leo, a family therapist. Leo had several meetings with Minnie, Rodriguez, Stanciel and the man who lived with Stanciel, Purcell Rogers. Minnie's visits with Stanciel eventually became unsupervised and gradually increased in length. At a September 25, 1989, court date, the DCFS indicated to the court that its goal was to place Minnie with Stanciel.

Thomas Leo testified at a status hearing on March 9, 1990, regarding the efforts to place Minnie with Stanciel. Leo stated he believed Stanciel would be an appropriate care giver for Minnie and that the unsupervised visits had been increased to three days in length.

---

[1]The respondent argues on appeal that this provision was not applicable to the proceedings on Stanciel's petition. This argument was not raised in the trial court and is accordingly waived for purposes of appeal. (*Skokie Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.* (1983), 116 Ill. App. 3d 1043, 1052, 452 N.E.2d 804.) Moreover, we find no merit to this argument because Stanciel's petition was filed after the effective date of the statute.

The visits went basically well, but there were problems with Minnie missing her foster mother, Betty Rodriguez. Leo recommended that guardianship remain with the DCFS and that visits be gradually increased with a target date of May 1990 for placement with Stanciel. On cross-examination by Stanciel's attorney, Leo was asked for the first time whether he believed that it would be in Minnie's best interest to be removed from the home of her foster mother and placed with Stanciel. The following exchange occurred:

> "[Counsel] Q: Do you believe that it is in the best interest of the child that Ms. Stanciel would be given custody of her?
>
> [Leo] A: No, I don't.
>
> [Counsel] Q: What do you believe would be in the interest of the child?
>
> [Leo] A: I believe the best interest of the child is for [sic] what I am able to see to this point would be to remain with the foster mother?
>
> [Counsel] Q: Do you believe well—
>
> THE COURT: That is not the goal. That is the law. So, I don't think we need to go into that any further. Relative placement is a priority. And that is what we are working for, *** relative placement."

Counsel for the foster mother then sought to question Leo about his opinion as to Minnie's best interest as follows:

> "[Counsel] Q: Mr. Leo, do you believe that relative placement is the greater weight and the best interest of the child?
>
> THE COURT: [Counsel], that is not the issue here.
>
> [Counsel]: I am trying to find—
>
> THE COURT: What he believes makes not [sic] difference. Let me tell you why. Relative placement is preferred when the child is not with the parents. And that is what is considered the best interest. Placement with the family—."

Leo was asked no further questions at that time concerning his opinion as to what was in the best interest of Minnie. He testified that Minnie seemed to enjoy the visits with Stanciel, but was very happy and anxious to return to Rodriguez and was uncommunicative regarding the next visit. Leo stated that he was directing all of his efforts toward placing Minnie with Stanciel.

Another status hearing was held on May 17, 1990, at which the guardian *ad litem* for Minnie requested the court to order a bonding assessment. The court granted the request, and Thomas Leo was then asked to testify concerning the status of visitation between Minnie and Stanciel. Leo stated that he made seven reports concerning Min-

nie's placement, beginning in August of 1989. His observations were that the visits with Stanciel had gone well, that Minnie seemed comfortable and that there were no problems with her eating or sleeping. However, separation from the foster mother had been very difficult. Minnie on occasion hid under her blanket and did not want to visit with Stanciel. Leo stated that Minnie was very strongly attached to Rodriguez and felt that her security was jeopardized by the visits. Leo also stated that he was in favor of a bonding assessment. He recommended an immediate transfer of custody to Stanciel, stating that "if the child is going to the grandmother's home, I believe she is about as prepared as she can be. This continually going back and forth is causing more trauma." Leo was asked on cross-examination whether he believed that it was in Minnie's best interest to be removed from Rodriguez' home and placed with Stanciel. He answered as follows:

"I'll answer this one last time; maybe I can try to put it a little better. Now in an ideal world I believe it would be better for the child to remain where she is, have liberal contacts, etc. with the grandmother, however, this is not an ideal world.

I believe that the plan of D.C.F.S. and the goal and mission is to return the child to the family, and I have been asked to assess the grandmother and find out whether she's a fit and proper parent that the child is able to attach with her to follow under her guidance and direction."

Leo stated that he did not believe that Minnie would be neglected or injured by Stanciel and that she was undergoing the kind of separation trauma often seen in foster children. On cross-examination, the guardian *ad litem* asked Leo whether he was aware that although placement with a relative is preferred, the DCFS could place the child elsewhere if it is in the child's best interest. The court sustained an objection to the question, stating, "That's not the law."

The hearing on Stanciel's petition for custody began on June 19, 1990. Minnie was 3½ years old at that time. Joe Ann Stanciel was the first witness. She testified that she first learned she was Minnie's grandmother in September or October of 1987. During the following year, she called the DCFS at least once each month to request visits with Minnie, but no one ever returned her calls. Stanciel was 45 years old and has lived in Chicago with Purcell Rogers for the past 17 years. She believed that it was in Minnie's best interest to be placed with her because she could do a good job raising the child. In Stanciel's opinion, Rodriguez is nice, but cannot control Minnie and lets her do what she wants to do. Minnie always cried at the beginning of visits, but would be fine after she calmed down. However, Minnie was

"always talking about home." If given custody, Stanciel would allow Minnie to have regular visits with Rodriguez.

Stanciel testified that her visits with Minnie went well until, at Thomas Leo's suggestion, she told the child that she wanted to have her stay for a long, long time. Since then Minnie has refused to go to Stanciel's home, so Stanciel would visit with Minnie at Rodriguez' home. Minnie would stop crying when she was assured that she would not have to go with Stanciel. Stanciel testified that the DCFS did not offer her services to deal with this problem, and she made no request for such services. Stanciel stated that she would be able to care for Minnie's vision problem. Minnie has a condition called aniridia; she was born without an iris. Stanciel's son—Minnie's father—also had this visual impairment.

Thomas Leo was then called as an adverse witness. Leo stated that he was a family therapist and had master's degrees in education and the humanities. He had completed a two-year post-graduate training program at Northwestern University School of Psychiatry, Division of Family Studies, and had completed two years of advanced supervision at Northwestern. The DCFS contracted with him to assess Stanciel and Rogers as potential caretakers for Minnie, to present a permanent plan for her placement and to assist in implementing the plan. He stated that he had spent more time on the case than any other social worker or therapist. Leo made seven written reports concerning this case between August 31, 1989, and April 28, 1990. The earlier reports stated that the visits between Stanciel and Minnie were going well, but that there was a strong attachment between Minnie and Rodriguez, the loss of which could cause deep psychological trauma to Minnie if accomplished too quickly. Both Rodriguez and Stanciel cooperated fully with Leo. Minnie related to Rodriguez as her mother and to Stanciel as her grandmother and told Leo that she wanted to "stay with her mommy," meaning Rodriguez. Leo stated that Minnie's relationship with Stanciel was a positive one, from which both could derive something. The reports showed that Minnie was comfortable with Stanciel and other family members, played with other children during the visits and enjoyed looking at family pictures. Stanciel lived in a well-maintained, nicely appointed home in the northwest part of Chicago. However, it was Leo's opinion that Rodriguez' responses to Minnie were more sensitive to the needs of the child, while Stanciel responded more to her own needs than to Minnie's. Although Rodriguez appeared keenly aware of the loss she would suffer if Minnie were placed with Stanciel, she was able to continue to focus on Minnie's needs.

Leo further testified that early in March of 1990, he recommended that Stanciel tell Minnie that Stanciel wanted her to come and stay with her for a long, long time. Since that time, separation from Rodriguez has become increasingly stressful and difficult for the child and she has exhibited regressive behavior. This resulted in frequent calls to him from Rodriguez and Stanciel at the beginning of visits. Leo believed that the withdrawal and anxious behavior exhibited by Minnie was caused by the fear that she might not be returned to her foster home if she left it for a visit with Stanciel. She also feels that she is being rejected and abandoned by Rodriguez.

Leo stated that based upon the very strong bond between Minnie and Rodriguez, he did not believe that placement with Stanciel was in Minnie's best interest. According to Leo, the ideal situation would be for Minnie to be raised by Rodriguez and have liberal visitation with Stanciel. She would have everything to gain and nothing to lose from this situation. Stanciel would not lose contact with Minnie, and Minnie would not be put through the enormous loss of her psychological mother, Rodriguez. When asked about the effect of a transfer of custody on Minnie, Leo responded as follows:

"The primary effect that I see is a lack of trust in adults to care for her. That this person who has cared for her up until this age is the only person that she knows as her mother. The person that she relies upon to meet all of her childhood needs of nurturing and keeping her under vigilance and guidance. This is an extremely close relationship. And if that is pulled apart, the child is going to be exposed. It would be like a raw wound *** ."

Leo stated that Minnie would probably interpret the transfer of custody as a rejection by Rodriguez, regardless of what she is told. He testified that it is extremely hard for a child removed from her home to bond successfully in another home. Leo stated that it is possible the child could "recoup a lot," depending on how the transfer occurred, but did not believe it would be in her best interest.

Leo admitted that he had previously recommended transferring custody of Minnie to Stanciel, but explained that he did so pursuant to the trial court's order to facilitate the transfer. After reading the results of the bonding assessment prepared by Dr. Carol Rolland, Leo stated that he would not recommend the transfer of custody.

The respondent called Dr. Carol Rolland to testify. Dr. Rolland testified that she is the clinical director of the developmental center at Illinois Masonic Medical Center, where she evaluates and treats young children from birth to eight years of age and also supervises

psychologists, interns and medical students in pediatrics. She has a bachelor's degree in psychology and a Ph.D. from the University of Illinois in child clinical psychology. She completed an American Psychiatric Association approved internship in child clinical psychology at Chicago-Read Mental Health Center during which she evaluated and treated seriously disturbed children and adolescents. Rolland's first professional appointment was with the University of Illinois, where she taught child psychology and clinical psychology. She then went to Illinois Masonic Medical Center and is currently on the faculty at the University of Illinois College of Medicine in Chicago. During her employment she has assessed 500 to 600 children concentrating on early development, separation and emotional disturbances of various kinds. Rolland has also done extensive work with foster children and adoptive parents. Following this review of her qualifications, Rolland was accepted by the court as an expert witness in the area of child development and child psychology with an emphasis on issues of attachment, separation and loss. Rolland was hired by the DCFS to interview all of the parties involved, review the history of the case and do a bonding assessment.

Rolland stated that Minnie and Rodriguez had a very strong primary bond. She described the primary bond as a relationship the child uses to determine both her security and also a sense of what is right. It is this relationship that sustains the child through frustrations and stresses. According to Rolland, the disruption of Minnie's relationship with Rodriguez would be extremely deleterious to the child psychologically and would create a loss from which Minnie would not recover. The profound loss of her psychological mother would create depression and anxiety in Minnie and would leave her with a sense of neediness and emptiness. The loss would also leave her vulnerable to the types of difficulties encountered by children when they become adolescents, such as drug abuse and pregnancy.

Rolland testified that disruption of the primary relationship dramatically affects a child's ability to trust. The child would be unlikely to form deep sustaining relationships with others because the risk of losing such a relationship is too painful. Rolland stated that it is normal for a child to experience trauma when she is taken away from the person she knows as her mother. Such an experience would put Minnie at great psychological risk. When Rolland was asked whether her concerns would be alleviated by liberal visitation with Rodriguez, she stated that they would not because "it would be like having your mother as a visitor," which is not a healthy psychological situation. Rolland further stated that the loss suffered by Minnie would be ir-

reparable and would not be alleviated by counseling because counseling "is really not a very good treatment for this kind of loss."

Rolland testified that Minnie made it very clear to her that she wanted to remain with Rodriguez. Rolland believed that Minnie would do everything in her power to maintain her relationship with Rodriguez because it is life-giving psychologically. Minnie has a good relationship with Stanciel and wants to be with her, but not at the cost of losing Rodriguez. Transitions were becoming more difficult because Minnie was experiencing parental alienation syndrome. She was becoming depressed, combative and aggressive when faced with visiting Stanciel. According to Rolland, Minnie's view of Stanciel is very much dependent on whether or not she feels threatened with the loss of Rodriguez.

Rolland's assessment of Stanciel was that, while well meaning, Stanciel is unable to take Minnie's needs into consideration and put them before her own needs. Rolland believed that Stanciel wants to adopt Minnie because she is anxious that the family provide for her instead of the State. Stanciel cares about Minnie, but is not primarily motivated to be a parent and to foster Minnie's own unique development to maturity. Rolland testified that Stanciel expected too much independence from Minnie and underestimated her educational and emotional needs. Stanciel tended to minimize Minnie's vision problem, stating that she hoped the other children would not notice it and that she hoped Minnie would not have problems in school. Based on Rolland's observations, Stanciel was extremely motivated to gain compliance from Minnie. During play, Stanciel directed Minnie to do things the way Stanciel wanted, causing Minnie to pull back and suck her thumb. Stanciel said that in time, Minnie would want to do things Stanciel's way. Rolland disagreed and predicted problems in conflict resolution.

Rolland's assessment of Rodriguez was that she wanted to be Minnie's mother. Rodriguez recognized that Minnie needed to be independent at some times and dependent at other times. If Minnie wanted to do things differently during play, Rodriguez was able to accommodate her. The two were able to comfortably interact and be together in a healthy way. Rodriguez' interest in doing the right thing for Minnie was paramount. Rolland stated that "[Rodriguez] was very concerned about the pain that Minnie is going through. She became tearful during the interview. She questioned whether she was doing the right thing, maybe she should just turn the baby over." To Rolland, this showed a very strong and powerful concern for Minnie and an ability to see things from Minnie's perspective. Rolland testified

that it would be in Minnie's best interest to remain with and be adopted by Rodriguez and to have Stanciel provide the role of grandmother. Rolland acknowledged that her opinion could have been different if the proceedings had taken place two years earlier.

Anna Campos testified that she is a social worker with the DCFS and was assigned to the case in January 1990. Campos stated that Minnie is very attached to Rodriguez and Rodriguez' daughter. Since the time she was told that Stanciel wanted to care for her for a long time, Minnie's behavior has deteriorated. When faced with visiting Stanciel, Minnie has been vomiting, urinating on herself and biting her nails until they bled. Rodriguez reported that Minnie had lost two pounds in one week. On one occasion she hid under a blanket and refused to go on the visit. Also, Minnie would cry and throw herself on the floor. While taking her to see Dr. Rolland, Minnie struggled and screamed so violently that Campos suffered a sprained wrist trying to get her into the car. Campos believed that Minnie feared that she would not be able to return to Rodriguez.

Campos further testified that Rodriguez has been very cooperative regarding Minnie's visits with Stanciel and believes that Stanciel should be a part of Minnie's life. In Campos' opinion, Stanciel is too rigid to meet Minnie's needs. Campos stated that it would be in Minnie's best interest to remain with Rodriguez and to visit with Stanciel. She acknowledged that bonding would not have been an issue if Minnie had been placed with Stanciel at the age of 10 months when Stanciel first requested custody.

Campos testified that DCFS records indicated that Stanciel met with a DCFS case worker on October 8, 1987, when Stanciel was visiting her son in jail. At that time, Stanciel indicated that she was interested in caring for Minnie. However, service plans for Minnie did not include Stanciel, and Stanciel did not have a visit with Minnie until May of 1989. A paternity test established in February of 1988 that Stanciel's son was Minnie's father.

Betty Rodriguez, Minnie's foster mother, testified that she wants custody of Minnie because she loves her very much. At the time Minnie entered her care, the DCFS represented that the placement would be permanent.

Stanciel called Marc Bennett as a rebuttal witness. Bennett testified that he is a forecast analyst with Inland Steel Company and was appointed by the court on March 3, 1989, as a court-appointed special advocate (CASA) on Minnie's case. He explained that a CASA worker is designated to investigate a case and make a recommendation concerning the best interest of the child. Bennett stated that he had a

bachelor's degree and received training for the CASA program during three eight-hour sessions. This was his first and only case, and he was not being paid for his services.

After visiting separately with Stanciel, then with Rodriguez and Minnie, Bennett issued a report recommending that it would be in the best interest of Minnie to be adopted by Stanciel. At that time, Stanciel had not yet had her first visit with Minnie. According to Bennett, Stanciel could provide Minnie with adequate care and love and has the means to care for her. Stanciel owned some property, and her financial situation was very good. Bennett explained that he believed it was in the best interest of a child to be placed with family, "all other things being equal." Also, he believed that it was in the child's best interest to be placed with a relative unless the relative was unfit. Bennett further based his recommendation on his view that the foster care program should be used only for temporary placement.

Bennett stated that Minnie was a bright, enthusiastic child with much energy. He observed visits between Minnie and Stanciel in Stanciel's home and Minnie appeared happy. Bennett observed no problems with the visits and had never seen Minnie being transported for a visit. He conceded that his opinion regarding visits might have been different had he been given the opportunity to discuss the problems associated with visits with the DCFS case workers. He stated that Minnie would suffer initial trauma in a transfer of placement and that she should be counseled thoroughly regarding any such transfer. He believed that counseling would reduce the trauma over a long period of time. It was Bennett's opinion that Minnie was reacting violently to visits and becoming physically sick because she was not being properly counseled as to what was happening. He did not believe that the trauma caused by a change of custody would be long term or irreparable, but acknowledged that his opinion might be different if Dr. Rolland had testified that the trauma would be irreparable. Bennett stated that he believed visitation with Rodriguez would help alleviate the trauma, but acknowledged that this belief was based upon his "general life experience" rather than on his training as a CASA worker.

At the conclusion of the hearing, the trial court vacated the guardianship of the DCFS administrator and appointed Stanciel private guardian and custodian of Minnie. The court ordered that Minnie receive counseling and that she be allowed to visit with Rodriguez. The findings of the court were related in a lengthy opinion. After review of the testimony, the court found that the DCFS "deliberately and without any legal justification" denied Minnie access to her pater-

nal relatives and made a commitment to the foster mother regarding adoption that the DCFS was not free to make. The court further found that the arguments concerning bonding were unpersuasive because if custody of the child had been given to Stanciel sooner, the bonding with the foster mother would not have occurred. Based on these reasons, the court found that it was not in Minnie's best interest to continue the guardianship of the DCFS administrator.

By her attorney, the public guardian, Minnie appeals the decision of the trial court on the grounds that it is against the manifest weight of the evidence. She argues that although placement with a relative is statutorily preferred, the DCFS in this case met its burden to justify placement elsewhere by showing that it was in Minnie's best interest to remain with her foster mother.

As quoted earlier, section 7(b) of the Children and Family Services Act provides that in placing a minor child under the Act, a close relative "shall be selected as the preferred care provider" and that "[i]t shall be the burden of the Department to justify the child's placement elsewhere." (Ill. Rev. Stat. 1989, ch. 23, par. 5007(b).) The preference for relative placement is in accord with one of the stated purposes of the Juvenile Court Act, which is "to preserve and strengthen the minor's family ties whenever possible." (Ill. Rev. Stat. 1989, ch. 37, par. 801—2(1).) Section 7(b) does not explicitly state what the Department must prove in order to meet its burden of placing the child with someone other than a close relative. However, it is well established that the paramount consideration in all guardianship and child custody cases is the best interest of the child. (*Moseley v. Goldstone* (1980), 89 Ill. App. 3d 360, 369, 411 N.E.2d 1145.) The best interest of the child takes precedence over even a natural parent's superior right to custody of his child. Section 1—2(3)(c) of the Juvenile Court Act specifically states that "[t]he parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. 1989, ch. 37, par. 801—2(3)(c).) As stated in *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417, 421, "[t]he best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent." It follows then that if the best interest of the child conflicts with the statutory preference for placement with a close relative, the best interest of the child should control the placement decision. The parties agree that the appropriate legal standard is the best interest of the child. They dis-

agree strongly, however, as to what the evidence below established regarding Minnie's best interest.

◼ In assessing the best interest of the child in matters of custody, the court must consider all "matters that have a bearing upon the welfare of the child." (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417, 421.) Among the appropriate matters to be considered are the nature and length of the child's relationship with the present caretaker (*In re Estate of Whittington* (1985), 107 Ill. 2d 169, 178, 483 N.E.2d 210), and the effect that a change of placement would have upon the emotional and psychological well being of the child. *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 211, 247 N.E.2d 417.

In the case at bar, Minnie has lived with her foster mother since she was four months old. Thomas Leo, the family therapist hired by the DCFS to assist in placing Minnie with Stanciel, testified that he had worked toward that goal since August of 1989. Nevertheless, it was his opinion that it was in the best interest of Minnie to remain in the custody of her foster mother and have liberal visitation with Stanciel. He gave two reasons for this opinion. First, Leo observed that Rodriguez' responses to Minnie were more sensitive to the needs of the child, while Stanciel responded more to her own needs than those of Minnie. Second, Minnie had developed a strong psychological bond with Rodriguez, the loss of which would cause Minnie to suffer deep psychological trauma. Leo stated that the best situation for Minnie would be for her to be raised by Rodriguez and have liberal visitation with Stanciel. According to Leo, Minnie would have everything to gain and nothing to lose by this arrangement.

Stanciel attempts to discredit Leo's testimony by representing that he had recommended a transfer of custody, then changed his mind at the last minute after reading Dr. Rolland's report. Based on our review of the record, we find this representation to be disingenuous at best. The record clearly establishes that from the first time he was asked, Leo maintained that a transfer of custody was not in the best interest of the child. However, after being told by the trial court that "placement with the family [is] what is considered the best interest" and that relative placement is "what we are working for," Leo recommended an immediate transfer of custody to Stanciel. Even then he qualified his recommendation, stating that "if the child is going to the grandmother's home, she is about as prepared as she can be." This is hardly the positive endorsement of a transfer of custody portrayed by Stanciel in her brief.

Dr. Carol Rolland, a psychiatrist who testified as an expert witness in the area of child development and psychology, also testified that it was in Minnie's best interest to remain in the custody of Rodriguez and to relate to Stanciel as her grandmother. This opinion, like Leo's, was based in part upon Rolland's view that Stanciel was unable to take Minnie's needs into consideration and put them before her own needs. The primary basis for Rolland's opinion, however, was her belief that given the strong primary bond between Minnie and Rodriguez, a transfer of custody would be extremely deleterious to Minnie psychologically and would cause her to suffer severe and irreparable trauma. Rolland testified that, in her opinion, counseling would not serve to alleviate the trauma.

We are aware that the trial court is generally free to disregard psychiatric testimony and that the opinions of a psychiatrist are only as valid as the bases or reasons supporting them. (*In re T.D.W.* (1982), 109 Ill. App. 3d 852, 855, 441 N.E.2d 155.) Here, however, it is apparent that the court disregarded Dr. Rolland's testimony concerning psychological bonding not because it was unfounded or unbelievable but rather because the court determined that such bonding would not have occurred had the DCFS acted sooner to accomplish the transfer of custody. This may be true, but it does not justify the trial court's refusal to consider evidence of psychological bonding as relevant to the issue of what was currently in Minnie's best interest. As stated earlier, the emotional and psychological well-being of a child are matters appropriately considered in determining what is in the child's best interest. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 211, 247 N.E.2d 417.) Whether or not the bonding between Minnie and her foster mother was caused by misconduct on the part of the DCFS, the clear and convincing evidence showed that such bonding did in fact occur and that a transfer of custody at this time would cause severe and irreparable psychological trauma to Minnie. In our view, it is not permissible to ignore or discount this evidence as a means of punishing the DCFS for its perceived misconduct.

Anna Campos, the DCFS social worker assigned to the case, testified very specifically concerning the outward manifestations of the trauma caused by Minnie's fear of losing her foster mother. She testified that in her opinion it would be in Minnie's best interest to remain with Rodriguez and visit with Stanciel. The only witness, other than Stanciel, to express the opinion that a transfer of custody to Stanciel would be in Minnie's best interest was Mark Bennett, a court-appointed CASA worker. The record shows that Bennett arrived at this opinion at a time when Stanciel had not yet had her first visit with

Minnie. Also, Bennett testified that based on his general life experience, he believed that any trauma suffered by Minnie would be alleviated by counseling, but admitted that his opinion could change if Dr. Rolland testified that the trauma would be irreparable. As stated earlier, Rolland did in fact testify that the trauma would be irreparable.

■■ ■ We are mindful that in reviewing a custody determination of the trial court, respectful weight must be given to the consideration that the trial court had the opportunity to observe the witnesses. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 210, 247 N.E.2d 417.) However, where we are persuaded that the judgment of the trial court is contrary to the manifest weight of the evidence, it is our duty to reverse. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 247 N.E.2d 417.) In the case at bar, we believe that the trial court's order vacating the guardianship of the DCFS and appointing Stanciel private guardian and custodian of Minnie was contrary to what the evidence showed to be in Minnie's best interest.

The judgment of the circuit court is accordingly reversed.

Reversed.

LINN, J., concurs.

JUSTICE JOHNSON, dissenting:

I respectfully dissent. I do not find that the trial court's decision was against the manifest weight of the evidence. Although the majority acknowledges that section 7(b) of the Children and Family Services Act (hereinafter Act) (Ill. Rev. Stat. 1989, ch. 23, par. 5007(b)) properly governs these proceedings, the clear mandate of the statute is ignored. The statute provides, in pertinent part:

"In placing a child under this Act, a close relative who comes forward *** shall be selected as the preferred care provider. *** '[C]lose relative' shall include a *** grandparent ***. It shall be the burden of the Department to justify the child's placement elsewhere." Ill. Rev. Stat. 1989, ch. 23, par. 5007(b).

Section 7(b) is a relatively new amendment and its interpretation, to date, has not been put in issue before this court. However, in Illinois it has long been held that when interpreting a statute the primary rule of construction is that the words of the statute must be given their plain and ordinary meaning. (*Illinois Power Co. v. Mahin* (1978), 72 Ill. 2d 189, 194.) This panel has held that "[w]here statutory language is certain and unambiguous it is [the] duty [of a court of

review] to enforce it as enacted." (*Stuart v. Niemann* (1981), 100 Ill. App. 3d 242, 243.) "If the legislative intent can be ascertained from the language of the statute, the language prevails and will be given effect; the court may not declare that the legislature did not mean what the plain language of the statute imports." *Hidden Cove Marina, Inc. v. Mondello* (1983), 117 Ill. App. 3d 21, 23; see also *Western National Bank v. Village of Kildeer* (1960), 19 Ill. 2d 342, 350.

The language in section 7(b) is clear and unambiguous. The legislative intent of the statute is that a "close relative" must be deemed the preferred caretaker unless the Department of Children and Family Services (hereinafter DCFS) can justify placing the child elsewhere. At the third reading of this statutory amendment, prior to its passage, Senator Karpiel briefly explained the proposed section:

> "[The amendment] is *** very simple ***. It provides that *** a foster child's close relative shall be the preferred care provider and that DCFS must justify reasons for placing the child elsewhere." 85th Ill. Gen. Assem., Senate Proceedings, June 28, 1988, at 142.

One of the authors of the amendment, Representative Parcells, prior to the second reading of the proposed amendment at a House of Representatives proceeding, explained that "any relative would be preferable to sending the child to a home with strangers." 85th Ill. Gen. Assem., House Proceedings, May 17, 1988, at 14 (statement of Representative Parcells).

This concern for primary placement with the child's natural family is also one of the fundamental purposes of the Juvenile Court Act of 1987. (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*) The purpose and policy statement of the Juvenile Court Act of 1987 provides, in pertinent part:

> "The purpose of this Act is to secure for each minor subject hereto such care and guidance *** as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; *to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her welfare or safety or the protection of the public cannot be adequately safeguarded without removal ***.*" (Emphasis added.) Ill. Rev. Stat. 1989, ch. 37, par. 801—2.

See also *In re Polovchak* (1983), 97 Ill. 2d 212, 223.

The Juvenile Court Act of 1987 "clearly directs the court before whom the minor is brought to release the minor to the custody of his parents rather than prescribe detention or shelter care ***." (*In re*

*Polovchak*, 97 Ill. 2d at 223.) Section 7(b) merely extends this directive so as to include a "close relative."

The preservation and strengthening of the minor's family ties are the clear purpose and policy of both the Juvenile Court Act of 1987 and section 7(b) of the Children and Family Services Act. Moreover, our supreme court in *In re Custody of Townsend* (1981), 86 Ill. 2d 502, held that the parent has superior and presumed rights to the child. The court found:

> "[I]t [is] clear that the interest of a parent in the care, custody and control of his or her child is fundamental and not to be ignored or facilely swept away in the face of a competing petition for custody filed by a third party." (*Townsend*, 86 Ill. 2d at 514.)

Section 7(b) would also extend this primacy principle to a "close relative."

When the minor is placed with someone other than a "close relative," the burden rests with the DCFS to justify the child's placement with this particular party. (Ill. Rev. Stat. 1989, ch. 23, par. 5007(b).) There is no dispute that the standard the DCFS must meet in order to justify the child's placement outside of the natural family is that which is in the best interest of the child. I do not find that the DCFS has met this burden.

Whether the presumption of superior rights is overcome depends upon the circumstances of each case. (*In re J.K.F.* (1988), 174 Ill. App. 3d 732, 734.) The trial court is given broad discretion in its assessment of the facts prior to making its determination in child-custody cases; "[o]nly where there has been an abuse of discretion or the judgment has been against the manifest weight of the evidence should the decision be reversed on appeal." *In re Stilley* (1977), 66 Ill. 2d 515, 520.

Our supreme court in *In re Stilley* stated:

> "The delicacy and difficulty of [the] child-custody and child-neglect cases justify the burden of responsibility placed on the trial court and the ensuing deference which must be given to the trial court. The trial court has the opportunity to observe the demeanor and conduct of the parties and witnesses. *** 'This is a vital factor in evaluating the correctness of [the trial judge's] determination. We should not disturb his findings unless they are palpably against the weight of the evidence.' " *Stilley*, 66 Ill. 2d at 520, quoting *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, 566-67.

After carefully reviewing the record, I do not find that the trial court's decision was against the manifest weight of the evidence. Without a lengthy recitation of the facts, I find certain pertinent data omitted by the majority.

Violetta B. spent the first four months of her life in the care of the DCFS and Theresa Lopez, a nominated foster mother. Violetta was then placed in the foster care of Betty Rodriguez. Joe Ann Stanciel did not learn of the birth of Violetta or that she was the child's grandmother until her son informed her of this fact while he was incarcerated. Violetta was 9 or 10 months old when Stanciel was told that she had a grandchild.

Stanciel then proceeded to contact DCFS employee Patricia La-Soya. Stanciel met LaSoya at the prison where her son was incarcerated. When she informed LaSoya that she wanted to visit her grandchild, LaSoya told her to contact the DCFS office.

Stanciel followed LaSoya's instruction and called the DCFS office, seeking visitation privileges with her grandchild. For more than one year, Stanciel's attempts to have the DCFS return her calls were futile. When Stanciel finally reached LaSoya, she was informed that she would have to retain an attorney in order to see her grandchild. Stanciel retained an attorney, went to court and was finally able to see her grandchild 22 months after her initial request.

Violetta's visits with Stanciel did not pose a problem until, at the behest of DCFS worker Thomas Leo, Stanciel told the child that she would like her to come and stay with her for a long time. Stanciel was ultimately seeking to have custody of the child. Stanciel also explained that Violetta would still have a relationship with her foster parent and visits with Rodriguez would continue.

The child reacted negatively to this suggestion as she had been in the care of Rodriguez since she was four months old. This negative behavior, as explained by Leo, is often exhibited in foster children going through separation trauma. Leo also testified that the relationship between Violetta and her grandmother was good:

> "[T]he grandmother has an awful lot to offer Violetta. The grandmother is very concerned about Violetta. She wants to be a good grandmother to the child. She wants to make sure the child is properly raised. She wants to have the child maintain contact with her and her family."

Leo's later recommendation that the child remain with Rodriguez was based upon an assessment made by Carol Rolland that Violetta had bonded with Rodriguez and should not be separated from her. I

also note that prior to Rolland's assessment, Leo had recommended that the child remain with her grandmother.

The trial court in its ruling appointing Stanciel as Violetta's private guardian analogized the case to one of a disingenuous baby-sitter. The trial court stated:

> "The arguments of D.C.F.S. regarding continued guardianship in the state are not persuasive. The arguments regarding bonding and primary caretaker are not unlike those of a trusted baby sitter who takes a small child, \*\*\* four months of age, and hides out with that child, denying the biological family all access to the child for a period of over three years.
>
> During this three-year period, the trusted baby sitter takes very good care of the child. The child and the baby sitter become bonded. The baby sitter becomes the primary caretaker for the child. When finally discovered, the trusted baby sitter argues that the Court should appoint him or her the legal guardian and allow him or her to adopt he [*sic*] child because the child is now bonded to him or her.
>
> To accept the position of the Department of Children and Family Services is to allow the Department of Children and Family Services to ignore the responsibility to children and to families, to deny children and their families access to each other for long periods of time, and to defeat the purposes and the intent of the Juvenile Court Act to maintain the integrity of the family. The law would become a joke. In this particular case, the legal guardian has already treated the law as a joke."

The trial court also brought out the fact that the child was placed with Rodriguez with the assurance that she would be able to adopt the child. As the trial court explained, "[t]his was a guarantee that D.C.F.S. could not legally make. The child was not free for adoption in 1987, and is not free for adoption now in 1990."

I do not find that the trial court's decision was against the manifest weight of the evidence. In the instant case, the foster mother and the child's natural grandmother were both able and fit to care for the child. This is not a case were one of the parties was abusive or did not provide a nurturing environment. In cases such as this, I find that the doctrine of the superior right of the natural grandmother should be controlling. It is in instances where the ability of the natural parent to care for the child is subject to question that removal of the child to a third party is found to be in the child's best interest.

For example, in *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, a case cited by the majority, the child was placed with his

maternal grandfather and removed from the care of his natural father. This was due to the fact that the child's father exhibited a complete lack of interest in the child for more than 11 years. The child was practically a stranger to his father. (*Livingston*, 42 Ill. 2d at 210.) In the instant case, unlike the father in *Livingston*, Stanciel has shown a strong concern for Violetta and a desire to be with the child since she learned of the child's birth.

In *Moseley v. Goldstone* (1980), 89 Ill. App. 3d 360, another case cited by the majority, the natural mother and putative father of four children had petitioned the court to award them custody of the children. The children were in the custody of their grandparents at the time of the petition. The petitioners alleged that the grandparents were infirm and that the children's present environment "seriously endangered their physical, mental, moral and emotional health." *Moseley*, 89 Ill. App. 3d at 363.

The appellate court reversed the trial court's order dismissing the petition and ordered the trial court to consider petitioners' allegations. Prior to making this ruling the court stated:

> "The importance of maintaining the family as a unit has long been considered central to the vitality of our societal fabric, and is indeed recognized by statute [citation]. The United States Supreme Court has held that the parental rights to custody of their children are constitutionally protected \*\*\*. \*\*\* Those rights must give way, however, where \*\*\* it is shown that custody by the natural parents is seriously challenged as being detrimental to the welfare of the children \*\*\*." *Moseley*, 89 Ill. App. 3d at 369.

In the instant case, custody by the grandmother has not been shown to be detrimental to Violetta's welfare. Stanciel is not in poor health nor do any of the parties challenge her fitness to be an adequate caretaker. In fact, as Stanciel points out, in the opening remarks of counsel for the public guardian, it was stated:

> "Now [*sic*] one is arguing that [the] paternal grandmother is not a fit or adequate caretaker."

I am aware that in Illinois the parent, or in this case a "close relative," need not be shown to be totally unfit in order to award custody to a third party. (*Giacopelli v. Crittenton House* (1959), 16 Ill. 2d 556, 565.) However, a child should not be prevented from reuniting with his or her natural family under the circumstances of this case.

The reunification of the family has become of increasing concern in Illinois. In *Norman v. Johnson* (N.D. Ill. 1990), 739 F. Supp. 1182, the Legal Assistance Foundation, on behalf of more than 6,000 impov-

erished parents who lost custody or were threatened with loss of their children by the DCFS, filed a complaint against the director of the DCFS. The plaintiffs alleged that they lost custody or were at risk of losing custody of their children because they were homeless or unable to provide food or shelter for the children. The court ordered, *inter alia*, the defendant to prepare case plans to facilitate in the reunification of these families.

It was recently reported that the parties had reached a settlement which included an agreement by the DCFS to stop its practice of summarily removing the children from "inadequate homes" except in those cases where the DCFS believes the children are in "imminent danger." (Karwath, *DCFS to Offer Grants to Clean Dirty Homes*, Chicago Tribune, January 26, 1991, News section at 6.) Even though the circumstances of this case are not as extreme as those in *Norman v. Johnson*, the majority has ruled against the reunification of Violetta with her natural grandmother.

The denial of custody to the parents or a "close relative" is based upon the theory that "the parents, through inability or unwillingness, have, by their own conduct, forfeited their right to the custody of the child." (*Ekendahl v. Svolos* (1944), 388 Ill. 412, 415.) In the instant case, Stanciel has not been shown to be unwilling or unable to care for Violetta. On the contrary, Stanciel's conduct has reflected her desire and ability to nurture and raise her own grandchild.

Stanciel's superior right to the child should not be curtailed in these circumstances. The ramifications of preventing the reunification of the family in this and like cases may have a detrimental effect upon the children in the future. Mary Anne Brown, one of the 13 experts ordered by the Federal court on August 31, 1990, in B.H. v. Johnson (N.D. Ill.), No. 88—C—5599, to investigate the DCFS in its placement of children under the age of 12 years, reported that 20,589 children were in substitute care in Illinois as of July 1990. Unnecessary out-of-home placement may have detrimental and far-reaching effects. The concern was expressed as follows:

"'How is it possible to convince a child of his own worth after removing him from a family which is said to be unworthy, but with whom he identifies?'" Mary Anne Brown, October 26, 1990, "B.H. v[.] Johnson Settlement Process Placement Services Under 12 Report," at 2, quoting Maya Angelou, author. See B.H. v. Johnson (N.D. Ill.), No. 88—C—5599, Final Consolidated Report of Rule 706 Panel of Experts.

Stanciel is Violetta's natural grandmother. She represents the family that Violetta will continue to identify with for the rest of her

life. To hold that Stanciel is unworthy to have custody of Violetta may have a serious effect on Violetta's own worth in the future. I find that Violetta's placement with Rodriguez, who is not the child's adoptive parent, may result in her later placement with another foster family and becoming lost in this substitute care system. It is not inconceivable nor unreasonable that this may also result in Violetta's permanent separation from her grandmother.

I agree with the trial court in its holding that reunification with the natural family would be in the child's best interest in this case. I do not find, under the circumstances of this case, that the trial court's decision was against the manifest weight of the evidence.

I would affirm the trial court.