2025 IL App (2d) 240514-U
No. 2-24-0514
Order filed January 27, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re E.M., Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | |
| | ) | |
| | ) | No. 22-JA-0122 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner-Appelle, v. D.M., Respondent-Appellant). | ) ) | Kathyrn Karayannis, Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's judgment terminating respondent's parental rights, concluding there exist no issues of arguable merit to be raised on appeal.

¶ 2    Respondent, D.M., appeals from the trial court's order finding her unfit to parent her child, E.M. (born in February 2022) and terminating her parental rights. Her appellate counsel has moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), stating that he has read the record and concluded there exist no issues of arguable merit to be raised on appeal. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (applying *Anders* to cases involving termination of parental rights).

Counsel has supported his motion with a memorandum of law providing a statement of facts, potential issues, and argument as to why those issues lack arguable merit. See *In re Alexa J.*, 345 Ill. App. 3d 985, 988 (2003) (holding in part that "counsel must identify at least one potentially justiciable issue in a motion to withdraw under *Anders*."). Counsel served respondent with a copy of the motion and memorandum. We advised respondent that she had 30 days to respond to counsel's motion. No timely response was filed. We conclude that this appeal lacks arguable merit based on the reasons set forth in counsel's memorandum. Therefore, we grant counsel's motion and affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                      A. Neglect Petition and Shelter Care Proceeding

¶ 5     On September 15, 2022, the State filed a neglect petition on behalf of six-month-old E.M., alleging that he was a neglected minor, and his environment was injurious to his welfare because his mother, D.M., had mental health issues which prevented her from properly parenting E.M., thereby placing him at risk of harm. A shelter care hearing was held that same day.

¶ 6     The trial court held the hearing via Zoom. The State confirmed notice was given to D.M. regarding the court time and her option to attend. The court noted D.M.'s absence and proceeded on an *ex parte* basis. A ten-day rehearing was scheduled by the court to allow time for a Putative Registry Search for E.M.'s father.

¶ 7     Brianna Giovanetti, a Child Protection Investigator with the Department of Children and Family Services (DCFS), reported that D.M. had had diagnoses of schizophrenia, anxiety, and depression. Ms. Giovanetti had responded to a medical neglect call and attempted to speak to D.M. at her home on September 14, 2022. DCFS had been referred regarding E.M.'s weight and missed medical appointments. E.M. had dropped from the eightieth percentile for weight at birth

to the thirteenth percentile and was diagnosed with failure to thrive, severe malnutrition, hypertonia, low muscle tone, and a risk for refeeding syndrome. Giovanetti testified that D.M. initially refused to answer the door. She would not make eye contact and took E.M. with her into a dark closet during the interview. D.M. told her that she had missed E.M.'s medical appointments because there were white vans outside and someone was watching her.

¶ 8 The court found probable cause to proceed with the petition and awarded temporary custody to DCFS. The court allowed supervised visitation at the discretion of DCFS. The court advised D.M. in absentia that she needed to cooperate with DCFS and correct the conditions that led to her temporarily losing custody of E.M. Failure to remedy the conditions could lead to involuntary loss of D.M.'s parental rights, warned the court. Finally, the court ordered CASA Kane County (CASA) appointed as Guardian ad Litem (GAL) for E.M. and scheduled a rehearing.

¶ 9 The court held the rehearing for E.M. on September 23, 2022. D.M. appeared via Zoom at this hearing and the court informed her of her rights, including the right to be present at all court dates. The court took notice that the Putative Father Registry Search had been completed and did not find a putative father for E.M.

¶ 10 D.M. confirmed E.M.'s birth details and stated that she did not know the identity of his father. She provided her address and phone number and confirmed she was not, nor had been, married. D.M stated she could not afford an attorney, and the court appointed a public defender to represent her. The court reminded D.M. that she needed to cooperate with DCFS and correct the condition that brought E.M. into temporary custody of DCFS. The court emphasized that failure to remedy the circumstances could result in D.M.'s parental rights being involuntarily terminated.

¶ 11 B. Adjudication and Disposition

¶ 12    The court held a pretrial conference prior to an adjudicatory hearing on November 17, 2022. The State had published notice to John Doe and any unknown fathers, as no father was named on E.M.'s birth certificate. There had been no response, so a default order was entered against John Doe and any unknown fathers. D.M. stipulated to the State's evidence of E.M.'s malnutrition and her own prior diagnoses of schizoaffective disorder, depression, and anxiety. The court found the stipulation was made freely and continued the matter for finalizing the adjudication and disposition. The court ordered that the Integrated Assessment and updated Client Service Plan be distributed to all parties before the next court date.

¶ 13    The disposition hearing was scheduled for December 20, 2022. D.M. did not appear on that date. The court decided not to proceed with the disposition during this hearing because the Integrated Assessment had not been distributed. Several pieces of evidence were admitted without objection. The case was continued for disposition in early January.

¶ 14    The dispositional hearing for E.M. was held on January 5, 2023. The court noted D.M. was absent again and had not been in contact with either her attorney or DCFS. The court determined it was in E.M.'s best interested to be made a ward of the court. D.M. was found unfit due to her mental health issues and her failure to participate. The court also found E.M.'s father unknown and unfit. The court set a goal of returning E.M. home within twelve months and awarded custody and guardianship to the DCFS. E.M. had gained weight, was preparing to walk, and was thriving in foster care with his foster mother, Rocio A., his fictive kin. The court emphasized the importance of D.M. engaging in therapies before visiting E.M.

¶ 15    The court held a status hearing on April 27, 2023. D.M. was absent, and the caseworker from Lutheran Social Services of Illinois (LSSI) reported inconsistent contact with her since she had been in and out of psychiatric hospitalizations. D.M. had visited E.M. once and claimed to

see burn marks on his hands. Others confirmed that E.M. had no burn marks. Rocio A. reported he was doing well, and she did not wish him to be moved from her care. The court confirmed with Rocio A. that she did not wish E.M. removed from her care and scheduled the permanency hearing for September 11, 2023. Appellate counsel summarized the hearing in his *Anders* motion but noted the hearing transcript was not included in the record of proceedings.

¶ 16                                    C. Permanency Review

¶ 17    On September 11, 2023, the court held the first permanency review for E.M. D.M. was again absent at the start of the hearing. The State requested the court to consider setting a Termination of Parental Rights (TPR) goal. Lydia Karjaka, the CASA GAL, requested to reserve the goal to give additional opportunities to contact D.M. Jesus Negron, attorney for DCFS, noted the legal screening was still pending. Walter Werderich, attorney for D.M., asked that the goal remain E.M. returning home to D.M. Rocio A., the foster parent, also reported limited communication with D.M. due to her mental illness, but did tell the court that D.M. was aware of E.M.'s placement and did not want Rocio A. to foster him.

¶ 18    D.M. joined the hearing in progress via Zoom and reported she had been most recently released from hospitalization a week prior. The court left E.M. returning home as the goal but asked the agency to concurrently plan towards both goals. The court reminded D.M. of the importance of maintaining regular contact with the Agency and engaging in the services outlined in the Service Plan to avoid the risk of the involuntary termination of her parental rights.

¶ 19    The court held a permanency review hearing over Zoom on December 13, 2023. D.M. did not appear. The court acknowledged receipt of the CASA report and the permanency report from Jasmine Allen, LSSI caseworker. The court noted that E.M. had been moved from placement with fictive kin Rocio A. in November 2023 and placed with the mother's 24-year-old brother, Daniel

M. The court noted the concern of the CASA GAL that Daniel M. resided with his parents and that the family harbored a hope that if Daniel M. adopted E.M., he could return the child to D.M. Allen confirmed that D.M. had not been involved in any services and was currently in a nursing home for her mental health issues. The court changed the goal to a petition to terminate parental rights, stating this was in the best interest of the minor child.

¶ 20 D.M. did appear via Zoom for the pretrial conference on April 24, 2024. The court instructed her to appear in person for the trial to avoid any connection issues. The court confirmed that service had been made on D.M. and that the State had published notice for John Doe or any unknown fathers. The deadline for proof had passed, and the court entered a default order against John Doe and any unknown fathers. The State filed a list of witnesses, exhibits, and materials, without objection, for judicial notice.

¶ 21 The court held a hearing on the State's petition to terminate parental rights on May 15, 2024. Emily H. was recognized as E.M.'s new foster parent and the court thanked her for all she was doing for him. This hearing was continued by the court so D.M.'s attorney could discuss her options relating to recent changes in E.M.'s foster care placement. D.M. was present for the hearing, and the court instructed her to appear for the new trial date.

¶ 22 D. Termination Proceedings

¶ 23 The court held the termination trial on August 12, 2024. The State and Public Defender were joined by council for CASA, the CASA GAL, LSSI caseworker Norma Johnson, D.M., and Philip U., one of E.M.'s foster parents. D.M.'s attorney moved for a continuance for the Agency to investigate whether one of D.M.'s sisters, currently living in Michigan, would be willing to be a permanent placement for E.M. The State and CASA objected and requested the hearing proceed to provide E.M. with permanency. The court, noting the aunt in Michigan had previously declined

placement and that E.M. had been in several placements over the past two years, denied the request to continue the case.

¶ 24                                    1. Unfitness Hearing

¶ 25    The State began by requesting the court to take judicial notice of several items, including the results of the putative father registry search, E.M.'s birth certificate, earlier court orders, and the 2023 service plan. There were no objections. The State then submitted multiple exhibits into evidence, including the integrated Assessment, the 2022 service plan, health records for E.M., and several medical records for D.M. They were admitted without objection.

¶ 26    The State called Norma Johnson, an LSSI supervisor, to testify regarding D.M.'s mental health issues, her lack of engagement in services, and her infrequent contact with the agency. Johnson confirmed D.M.'s multiple hospitalizations during the past two years and opined that D.M. genuinely loved E.M. Johnson testified that D.M. had indicated a willingness to participate in a service plan with parenting coaching and education, but that she did not participate in the service plan and seldom visited E.M. On re-direct, Johnson confirmed that D.M. had allowed her medical information to be shared with the agency for a short period before apparently revoking her consent.

¶ 27    D.M. testified about her multiple hospitalizations, treatments, and her current residence at the North Aurora Care Center. She admitted that she had not been compliant with her medication before E.M. came into care. Under cross examination, D.M. listed previous medications and testified as to which ones she believed had been successful in her treatment. She claimed that she had been medically compliant since E.M. went into care, but did admit that she did not sign consent for her medical records to be shared with LSSI while hospitalized prior to her commitment to the North Aurora Care Center.

¶ 28    In closing, the State argued D.M. failed to maintain a reasonable degree of interest, concern or responsibility.  The State noted that D.M. had missed multiple visits with E.M. and did not provide proof of mental health services allegedly received, and argued that her failure to remain medication-compliant was a failure to protect E.M.  D.M.'s attorney countered that D.M. was making efforts to address her mental illness and was working to correct the conditions that led to E.M. being brought into care.

¶ 29    The court found by clear and convincing evidence that the State has proven the allegations in its petition for termination of parental rights.  While the court acknowledged D.M. had made efforts, she had not made progress.  The court found that D.M. had failed to maintain a reasonable degree of interest, concern, or responsibility for E.M. and failed to protect him.  While the court stated that "I don't have any doubt that you love your son," the evidence supported the conclusion that D.M. had stopped taking medication several times and E.M. suffered as a result.  It was clear that D.M. was attempting to address her "significant mental health concerns," the court found, but it was equally clear the court could not find her to be a fit parent.

¶ 30    The court further found that no father had stepped forward to protect E.M. and no father had shown any reasonable degree of interest, care, concern, or responsibility for the child.  The court found both parents unfit.

¶ 31                              2. Best Interest Hearing

¶ 32    At the start of the best interest proceedings, prior testimony by Savannah Schiavoni, an LSSI caseworker, was admitted without objection.  Schiavoni testified about E.M.'s strong bond with his foster family and the family's willingness to support E.M.'s cultural background.  She also explained that one of the reasons that E.M. had been moved from placement with his uncle was the uncle's failure to enroll E.M. in preschool, something the new foster family did quickly.

¶ 33    Norma Johnson was recalled by the State.  Johnson testified in greater detail regarding E.M.'s prior placements and the family's insistence that E.M. be moved from Rocio A. to his uncle, Daniel M.  She further explained that placement with Daniel M. was disrupted when conflict arose within the home between Daniel M. and his father, Daniel Sr.  Daniel M. had called the caseworker during a heated argument and stated that he would be moving out of the house and leaving E.M. with Daniel Sr.  Johnson testified that Daniel Sr. denied the scope of D.M.'s mental health issues and repeatedly stated that he would return E.M. to D.M. after the adoption.  No other family options were available.

¶ 34    In closing, the State argued it was in E.M.'s best interests to terminate the parental rights of D.M. and John Doe.  The State, and the attorney for CASA, emphasized the stable and nurturing environment that E.M. enjoyed with his foster family.  The State noted safety concerns with E.M.'s previous placements and how he had been thriving since he was placed in a calmer environment.  D.M.'s attorney countered that not enough had been done to find family members for placement.

¶ 35    The court found by clear and convincing evidence that it was in E.M.'s best interests that the parental rights of both parents be terminated.  The court advised D.M. of her right to appeal, the right to an attorney, and the process for requesting an attorney if she could not afford one.  This appeal timely followed.

¶ 36                        E. *Anders* Motion

¶ 37    The trial court appointed counsel to represent D.M. on appeal.  Appellate counsel filed a motion to withdraw pursuant to *Anders* and *Alexa J.*  The clerk of this court also issued an order notifying respondent of the motion and allowing her 30 days to respond.  The 30-day period has passed, and respondent has not filed a response.

¶ 38                        II. ANALYSIS

¶ 39    In support of his motion to withdraw, appellate counsel reviewed over 4,700 pages of the record and closely examined each of the hearings for constitutional, procedural, or evidentiary issues that would constitute a basis for an appellate challenge.  As summarized in his 32-page motion, appellate counsel examined potential challenges to due process and evidentiary impropriety and investigated whether the court's unfitness and best interests findings should have been delayed to allow D.M. a greater opportunity to restore her mental health.

¶ 40    The Juvenile Court Act (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth a two-stage process for the involuntary termination of parental rights.  *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.  The State initially has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)).  See 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010).  If the court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the best interests of the child.  See 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d 347, 367 (2004).  On appeal, this court will not disturb a trial court's finding as to parental unfitness or a child's best interests unless it is against the manifest weight of the evidence.  *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43.  A decision is against the manifest weight of the evidence where the decision is unreasonable.  *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 41    Under the procedure outlined in *Anders*, counsel's motion must "be accompanied by a brief referring to anything in the record that might arguably support the appeal."  *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000).  Counsel is obligated to advocate on behalf of his or her client.  *Alexa J.*, 345 Ill. App. 3d at 987. As such, counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments

are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Next, counsel must conclude that no viable grounds exist for the appeal. Finally, appellate counsel should include the transcripts from the fitness and best-interest hearings. *Alexa J.*, 345 Ill. App. 3d at 989. In doing so, counsel must review both the finding of unfitness and the best interest determinations. *S.M.*, 314 Ill. App. 3d at 686.

¶ 42 Initially, appellant counsel examined the case "to ensure D.M.'s bond with E.M. is respected, and due process was not cast aside by State overreach." Counsel did not find any procedural due process concerns related to the trial court's conduct of proceedings. He noted that the court "appeared to pay particular attention to assuring the Sixth Amendment right of representation of D.M. was established and maintained free of conflict." Similarly, counsel found no issues with regards to evidentiary introduction, admissibility, or sufficiency.

¶ 43 *Alexa J.* demands an accompanying *Anders* brief "set out *any* irregularities in the trial process or other potential error, which, although in [counsel's] judgment not a basis for appellate relief might *** be meritorious." (Emphasis in original.) *Alexa J.*, 345 Ill. App. 3d at 987 (quoting *In re Brazelton*, 237 Ill.App.3d 269, 271 (1992)). In accordance with *Alexa J.*, counsel identified one potential challenge: "should D.M.'s many efforts to regain her mental health before and during the pendency of the case along with familial tie considerations be considered sufficient to provide a basis for the court to delay a termination finding with regard to best interest notwithstanding the finding of unfitness."

¶ 44 In assessing the best interests of a minor, the trial court must look at all matters bearing on his welfare. *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991). The interest of a parent in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re D.T.*, 212 Ill. 2d 347, 364 (2004); *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 56. The Act provides factors to consider for determining whether the best interests of the minor are served by

terminating parental rights. See 705 ILCS 405/1-3(4.05) (West 2022). However, the court is not required to make a specific reference to each factor in its findings. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 45 As to the best interests finding, the trial court addressed the minor's need of permanency, noting that E.M. had been placed multiple times in homes with relatives and fictive kin. E.M. had been in foster care for almost two years, and his development had markedly slowed down when he was placed with his uncle, Daniel M. The court considered D.M.'s continued mental health issues and her family's expressed desire to return E.M. to her when they determine that she is "better". E.M. was thriving in his most recent placement, noted the court, and it was a "placement that is safe and stable that is providing for all of [his] needs." The court found by clear and convincing evidence that it was in E.M.'s best interests to terminate the parental rights of D.M. and John Doe.

¶ 46 Based on the foregoing, we cannot conclude that the trial court's fitness finding was against the manifest weight of the evidence. Thus, we agree with counsel that no viable argument challenging the court's fitness finding could be raised. We also agree that no viable argument can be raised concerning the court's best interests' determination.

¶ 47                                    III. CONCLUSION

¶ 48 After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit. We grant the motion to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 49 Motion granted; affirmed.