(Nos. 97531, 97580 cons.—)

*In re* AUSTIN W., a Minor (Timothy D. Berkley, Guardian *ad litem*, Appellee, v. The Illinois Department of Children and Family Services, Appellant (Rosemary Fontaine, Appellant)).

*Opinion filed January 21, 2005.*

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Department of Children and Family Services.

Michael Brody, David J. Richardson and Beth A. Davis, of Winston & Strawn, of Chicago, for appellant Rosemary Fontaine.

Anthony E. Dos Santos, of Meyer & Dos Santos, P.C., of Alton, for appellee guardian *ad litem*.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Timothy D. Berkley, guardian *ad litem* (GAL) for Austin W., an abused minor, filed a motion in the juvenile division of the circuit court of Madison County to modify the dispositional order which placed Austin W. in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS). DCFS and Rose-

mary Fontaine, Austin's foster mother, opposed the motion. After a hearing, the circuit court modified the dispositional order, removing DCFS as the custodian guardian and placing Austin in the custody and guardianship of his maternal grandfather and stepgrandmother, William and Wendy Ward (the Wards).

DCFS and Fontaine appealed the circuit court's decision. The appellate court affirmed the lower court's order. No. 5—02—0390 (unpublished order under Supreme Court Rule 23). We granted petitions brought by DCFS and Fontaine for leave to appeal to this court. 177 Ill. 2d R. 315. The appeals have been consolidated for our review.

## BACKGROUND

Austin's mother, B.W., first came to the attention of DCFS in April of 1996, when Austin's siblings, Chelsea H. and Nicholas W., were taken into protective custody because Chelsea, who was then seven months old, had cuts, bruises, and welts. The children were adjudicated abused and placed in foster care. The children were returned to B.W. in September 1996, but came back into care in May 1997, when the children were again found to be abused and neglected by B.W. due to risk of harm, medical neglect and inadequate supervision.

B.W. gave birth to a second daughter, Casey W., on August 24, 1997, and she, too, was taken into custody by DCFS. The record shows that Casey and Chelsea were in several foster homes before they eventually were placed with the maternal grandfather and stepgrandmother, William and Wendy Ward.[1] Nicholas remained in foster care until January 1998, when his biological father gained custody of him.

---

[1] It is unclear when Casey began living with the Wards, but the record shows that in February of 1999, Chelsea was placed with the Wards after they expressed an interest in a subsidized adoption of her.

On May 27, 1999, B.W. surrendered her parental rights to all of her children. B.W. signed a "final and irrevocable surrender to an agency for purposes of adoption of a born child," giving DCFS the power to consent to Chelsea's adoption. With regard to Casey, however, B.W. entered into a private guardianship agreement with her father and stepmother, William and Wendy. Nicholas remained with his biological father.

It is against this backdrop that Austin W. was born on June 25, 1999. Austin was taken into protective custody upon his release from the hospital due to "risk of harm." After a shelter care hearing, DCFS was awarded temporary custody of Austin. See 705 ILCS 405/2—10 (West 2000). DCFS then filed a petition alleging that Austin was an abused minor based on risk of physical harm due to the fact that B.W. had four prior indicated reports of abuse. It was also noted in the petition that B.W. had surrendered her parental rights to her other children after it was determined that she had failed to make reasonable progress and failed to correct the conditions that led to the children's removal. Although Austin was initially placed in a nonrelative foster home, in August 1999, he was placed in foster care with the Wards, where his two sisters were living.

In October 1999, Central Baptist Family Services (Central Baptist), a private agency under contract with DCFS, became the service providers for Chelsea and Austin. Lisa Dulski, an employee of Central Baptist, was the caseworker whose job it was to monitor the foster care placement of Austin and Chelsea with the Wards.

An adjudicatory hearing (see 705 ILCS 405/2—14, 2—18, 2—21 (West 2000)) for Austin was held in November 1999, at which time B.W. stipulated to the allegations in the abuse petition. Accordingly, Austin was adjudged an abused minor. On January 12, 2000, a dispositional hearing was held. See 705 ILCS 405/2—22 (West 2000).

At this hearing, it was determined that it was in Austin's best interests that he be made a ward of the court and placed in the custody and guardianship of DCFS. A permanency goal of "return home within one year" was set to give B.W. an opportunity to demonstrate her ability to adequately care for Austin.

A little over two months later, on March 28, 2000, William Ward took Austin to Provena St. Joseph's Hospital after the Wards noticed a "soft spot" on the side of nine-month-old Austin's head. At the hospital, Austin was first seen by his primary physician, Dr. Alcala, who ordered that Austin have a skull X ray. The hospital contacted Lisa Dulski to obtain consent for medical treatment. In this way, Lisa first became aware that Austin had been injured.

The skull X ray taken at St Joseph's Hospital was deemed "unremarkable." The Wards were told to treat the "soft spot" first with ice packs, then with heat, and to follow up with their physician in one week. At 8:30 that evening, Wendy spoke to Lisa Dulski. Although Wendy said that Austin was not fussy or crying, had no fever, and was not vomiting or showing signs of pain or discomfort, Wendy expressed concern because the spot appeared to be getting larger. Wendy told Lisa that the only time she could remember Austin hitting his head was the morning of the day before, when she was giving him his bath. Wendy said that, after wrapping Austin in a towel, she hit Austin's head on the corner of the vanity as she stood up. She noted, however, that the "soft spot" was not in the same location as where his head struck the vanity.

The next morning, on March 29, 2000, Wendy contacted Lisa and informed her that she had discovered a sore or blister in Austin's mouth. It was decided that Austin should be reevaluated. Because William was at work and Wendy was caring for Austin's siblings, Lisa

agreed to transport Austin to Silver Cross Hospital for a second opinion.

At Silver Cross Hospital, Austin's outward appearance did not suggest that his injury was severe. Upon examination, however, it was determined that he had a fever of 101 degrees and a sore in the back of his throat. He was evaluated for bruises, though none were found. Austin's blood and urine were tested and he received a CAT scan. The CAT scan revealed a skull fracture toward the back left side of Austin's head. According to the physician, it was unlikely that the fracture could have resulted from striking the child's head on the vanity because there was no bruise and because a skull fracture would require a much greater impact. The physician at Silver Cross recommended that Austin be seen by a neurosurgeon at Children's Memorial Hospital in Chicago so that the fluid in the "soft spot" could be analyzed.

On the evening of March 29, 2000, the Wards took Austin to Children's Memorial, where a second CAT scan was performed. While at the hospital, the Wards met with the hospital's social worker, Sarah Mass. Wendy told Sarah that she and William had been the sole and exclusive care providers for Austin over the past several days and that she did not know how or when Austin was injured.

On March 30, Sarah Mass spoke with Lisa Dulski and informed her that the hospital wanted to conduct a bone scan on Austin to determine whether there were any additional fractures or signs of injury. An appointment was made for April 3, 2000. In addition, because of the unexplained nature of the skull fracture, Sarah felt that a safety plan should be implemented until Austin's next evaluation. If Austin was to remain with the Wards, the Wards should have another adult in the home with them at all times.

Lisa contacted the Wards and explained the situa-

tion. Initially, the Wards agreed to cooperate with the suggested safety plan. However, they later changed their minds. Unhappy with Children's Memorial and the implication that they had abused Austin, Wendy asked Lisa if they could take Austin to some other medical facility. Lisa, who apparently agreed that the safety plan suggested by Children's Memorial was unnecessary, contacted Healthworks (a health care management program for DCFS wards) on March 31, 2000, to obtain a recommendation for another physician. A Healthworks nurse, Jackie Bickle, spoke with Lisa about Austin's condition and provided her with some physicians' names. However, based on the injuries, the Healthworks nurse also insisted that Lisa call the hot line to make a report of "suspected abuse, unknown perpetrator." After checking with her supervisor, Lisa called the hot line and made the report. Children's Memorial also called the hot line after Sarah Mass learned that the Wards were refusing to comply with the safety plan and would not bring Austin in for further testing.

On the evening of March 31, 2000, in response to the hot line reports, DCFS removed Austin and his two sisters from the Wards' home. On April 4, 2000, a shelter care hearing was held. Austin's sisters were returned to William and Wendy on the condition that they agree to a safety plan which involved regular announced and unannounced visits to the home. Austin, however, was placed with a maternal aunt, Andrea, and the Wards were to have no contact with him.

On April 6, 2000, Austin was admitted to Children's Memorial for further testing and overnight observation. The bone scan revealed that Austin had a healing fracture in his right leg (tibia). The scan indicated that the fracture was between one and three months old. Dr. Flaherty examined Austin and discovered a linear bruise on his left leg that appeared to be about one week old.

Based on this additional information, Austin's sisters were, once again, removed from the Wards' home on April 12, 2000. Austin was removed from the aunt's home and placed in the foster home of Rosemary Fontaine. The girls were examined for bruises, though none were found. Chelsea reported, however, that Wendy used corporal punishment (spanking) on both her and Austin. Further, Chelsea said that when Wendy disciplined Austin, Wendy would take Austin into the bedroom and close the door. If Chelsea asked Wendy what she was doing, Chelsea was told to "mind her own business."

Chelsea and Casey remained in nonrelative foster care until May 18, 2000, at which time they were returned to the Wards on the condition that the Wards comply with "rules of supervision" for one year, without an admission of abuse.

In July 2000, Austin's putative father filed a denial of paternity and a consent to Austin's adoption.

On September 29, 2000, DCFS completed its investigation with regard to the report of suspected child abuse of Austin by the Wards. DCFS "indicated" the report, meaning that DCFS found that there was "credible evidence" that the Wards had abused Austin. See 325 ILCS 5/3 (West 2000). Soon after, the Wards filed an administrative appeal. A hearing was held before an administrative law judge (ALJ) to determine whether the indicated finding should be expunged. See 325 ILCS 5/7.16 (West 2000). The administrative hearing took place on several dates throughout 2001—January 23, January 24, April 3, April 5, August 29, September 17, October 15, October 18, November 7, December 3 and December 17. Transcripts were received on January 4, 2002, and the record was closed on January 11, 2002, after the Wards elected not to file a surreply. It should be noted that, in her opinion, the ALJ explicitly held that the Wards' due process rights were not violated by the

extended review process because: (1) the Wards' attorney failed to appear on the first scheduled hearing date, (2) the Wards' attorney requested and agreed to several continuances based on his own availability and the availability of his witnesses, and (3) in April 2001, when the hearing was nearly completed, the Wards dismissed their attorney and hired new counsel, who disclosed new witnesses and requested additional continuances to accommodate those witnesses' schedules.

While the administrative hearing progressed, DCFS continued to work with B.W., Austin's mother. B.W., however, stopped attending counseling and failed to contact the caseworker. She had no visitation with Austin for several months. Consequently, DCFS petitioned to terminate B.W.'s parental rights to Austin. A finding of unfitness was entered February 8, 2001. In light of that finding and the putative father's denial of paternity and consent to Austin's adoption, the court entered an order on May 18, 2001, holding that it was in Austin's best interests to terminate the parental rights of both the mother and putative father. The dispositional order was modified. Austin was to remain a ward of the court and DCFS was to remain the guardian; however, DCFS was now given the power to consent to Austin's adoption. A permanency hearing was held in June 2001, at which time the court approved the permanency goal set by DCFS of adoption by Austin's current foster mother, Fontaine. At a subsequent permanency hearing in December 2001, the same goal was approved by the court. Berkley was present at both of these hearings.

On January 25, 2002, the ALJ issued her written recommendation and opinion. The ALJ ruled that a preponderance of the evidence supported the indicated finding by DCFS as to allegation No. 2 (skull fracture), allegation No. 9 (bone fracture), and allegation No. 22 (substantial risk of physical injury). By letter dated April

4, 2002, the Director of DCFS notified all interested parties that the decision of the ALJ had been adopted as the final administrative decision of the Department. The Wards then sought judicial review under the Administrative Review Act, as provided by statute. 325 ILCS 5/7.16 (West 2000).

On March 6, 2002, after the ALJ issued her recommendation, but before the Director of DCFS adopted the recommendation as the final decision of the Department, Timothy Berkley, who had been Austin's guardian *ad litem* since at least November 1999, filed a petition in the circuit court of Madison County, seeking to modify the January 12, 2000, dispositional order which placed Austin in the custody and guardianship of DCFS. Berkley asked that custody and guardianship of Austin be awarded to Austin's grandfather and stepgrandmother, William and Wendy Ward, and that they be permitted to adopt Austin "without delay."

Hearing on Berkley's motion was taking place when the Director adopted the ALJ's recommendation. The circuit court of Madison County was made aware of DCFS's final determination on the abuse report. Nevertheless, on May 30, 2002, the court granted Berkley's motion, terminated DCFS's guardianship of Austin, and placed him in the custody and guardianship of William and Wendy Ward.

In its written ruling on the motion, the Madison County circuit court acknowledged the ALJ's decision, but held that it was not bound by it. Moreover, the court held that the ALJ's decision and the decision of the Director "are not considered substantive evidence." The Madison County circuit court heard no expert medical testimony and simply reviewed the medical testimony presented to the ALJ. Despite this fact, the circuit court reached conclusions opposite to those reached by the ALJ regarding the credibility of the expert medical wit-

nesses and, contrary to the ALJ, concluded: "In reviewing the testimony of Dr. Flaherty and Dr. Sullivan, this court does not find that that evidence, by a preponderance, proves abuse in this matter."

The court was most persuaded by the personal views of the Central Baptist caseworker, Heather Kocisko, who believed that the Wards had not abused Austin. It was shown, however, that Kocisko had not been the Wards' caseworker at the time of Austin's injury and was unaware of much of the expert medical evidence which formed the basis of the ALJ's decision.

The Madison County circuit court also found the Wards to be "credible" witnesses, in direct conflict with the findings of the ALJ. The court found the Wards credible, even though the Wards did not testify under oath before the court, choosing instead to address the court in narrative form, and did not make their testimony before the ALJ part of the record.

DCFS and Fontaine appealed. The Madison County circuit court order modifying the January 12, 2000, dispositional order as to Austin's guardianship was stayed by the appellate court pending appeal.

On July 28, 2003, the circuit court of Will County issued its ruling on the Wards' appeal from DCFS's administrative decision to uphold the indicated finding of abuse against the Wards. The Will County circuit court affirmed the administrative decision, ruling that the ALJ's factual findings were not against the manifest weight of the evidence and that the ALJ's legal and administrative rulings were not clearly erroneous. The Wards did not appeal this ruling.

On October 17, 2003, the Fifth District of the appellate court, in a Rule 23 order, affirmed the Madison County order terminating DCFS's guardianship of Austin and placing Austin in the care and custody of William and Wendy Ward. Without citation to any authority, the

reviewing court agreed that the ALJ's determination was not binding on the circuit court. The appellate court then concluded simply that the circuit court's finding that it was in Austin's best interests to transfer guardianship was not against the manifest weight of the evidence. It is from this ruling that DCFS and Fontaine were granted leave to appeal to this court. As noted earlier, their appeals have been consolidated by order of this court.

## ANALYSIS

DCFS and Fontaine each raise the following two issues in their consolidated appeals before this court: (1) whether, in all cases, a change in circumstances must be proven as a predicate to the best-interests determination whenever modification of a prior dispositional order regarding custody is sought pursuant to section 2—28(4) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2—28(4) (West 2000)), and (2) whether, in the case at bar, the circuit court's decision to remove Austin from the custody and guardianship of DCFS and to place him in the custody and guardianship of the Wards was against the manifest weight of the evidence. Before addressing these issues, we first examine the Juvenile Court Act (705 ILCS 405/1—1 *et seq.* (West 2000)).

The Juvenile Court Act is a statutory scheme, created by the legislature, the purpose of which is to secure for each minor subject thereto the care and guidance which will best serve the minor's safety and moral, emotional, mental and physical welfare, and the best interests of the community. 705 ILCS 405/1—2 (West 2000). Pursuant to this statutory scheme, once a child has been adjudicated abused, neglected or dependent (705 ILCS 405/2—21 (West 2000)), the court must determine whether it is in the best interests of the child to be made a ward of the court and the ''proper disposition best serving the health, safety and interests of the minor and the public.'' 705 ILCS 405/2—22(1) (West 2000). Although

dispositional orders are generally considered "final" for the purposes of appeal (see *In re W.C.*, 167 Ill. 2d 307, 326 (1995)), they are subject to modification in a manner consistent with the provisions of section 2—28 of the Act (705 ILCS 405/2—23(2) (West 2000)). Subsection (4) of section 2—28 of the Act (705 ILCS 405/2—28(4) (West 2000)) provides:

"The minor or any person interested in the minor may apply to the court for a change in custody of the minor and the appointment of a new custodian or guardian of the person or for the restoration of the minor to the custody of his parents or former guardian or custodian."

In *In re S.M.*, 223 Ill. App. 3d 543, 547 (1992), the court noted that hearings conducted on petitions for a change in custody are simply further dispositional hearings, which must be conducted in accordance with section 2—22(1) of the Act. Thus, "just as the court at the dispositional hearing conducted under section 2—22(1) of the Act 'shall determine the proper disposition best serving the interests of the minor and the public,' so should a court, hearing a petition [for a change in custody], 'determine the proper disposition best serving the interests of the minor and the public.' " *In re S.M.*, 223 Ill. App. 3d at 547. Accordingly, once a child has been made a ward of the court and a dispositional order has been entered, the court may, at any time, vacate the original dispositional order and enter any other dispositional order that it could have entered under section 2—23(a) of the Act, thereby effecting a change in the custody and guardianship of the minor, if the court finds that to do so would be in the best interests of the child.

## Change of Circumstances

In the case at bar, Fontaine and DCFS maintain that a modification of the dispositional order with regard to custody and guardianship made pursuant to section 2—28(4) of the Act, though not explicitly, implicitly

requires a showing that a change of circumstances has occurred as a condition precedent to the best-interests inquiry. In other words, they contend that, as a predicate to the court's exercise of its authority to change the custody and guardianship of one of its wards, the court must first make a determination that there has been a change in the attendant circumstances of the case. Moreover, DCFS and Fontaine contend that, where DCFS is the custodial guardian of the child, a specific type of "change in circumstances" must be shown, *i.e.*, that DCFS has failed to fulfill its duties under the Act, and that a finding to this effect, based on sufficient proof, must be made before the court may remove DCFS as the custodial guardian of the minor ward. We disagree.

As Fontaine and DCFS point out, when deciding whether to modify a dispositional order, courts have generally considered whether the modification was "warranted by a change in circumstances." See *In re Brandon S.*, 331 Ill. App. 3d 757, 760 (2002); *In re P.P.*, 261 Ill. App. 3d 598, 605 (1994). In *In re D.S.*, 307 Ill. App. 3d 362, 366 (1999), the court, citing to *In re P.P.*, stated, "We believe that when a minor is the ward of a court and under its protection, the above cited provisions [705 ILCS 405/2—22(1), 2—23(3)(iii) (West 1994)] give the juvenile court the authority to vacate any dispositional order upon a finding that a change in circumstances has occurred warranting such an action." Although these cases suggest that a "change of circumstances" may be a significant factor in the decision to modify custody, we do not interpret these cases to mean that the court's exercise of its statutory authority to modify a dispositional order, particularly with regard to custody, must be predicated on a separate finding of a "change in circumstances" so that the sufficiency of evidence with regard to such a finding is reviewable. Rather, the question of whether a change in circumstances warranting modification of the

dispositional order has occurred is a matter which is subsumed in the "best-interests" inquiry.

It is self-evident that when a person authorized by statute brings a petition to *modify* a prior dispositional order regarding the custody and guardianship of a child who has been made a ward of the court, a dispositional order is already in existence. This means that the court has previously considered the various kinds of dispositional orders regarding custody and guardianship which, pursuant to statute, could be entered and determined the proper dispositional order best serving the interests of the ward. 705 ILCS 405/2—23(a) (West 2000). Thus, as a practical matter, a petition to modify the custodial arrangement of a ward of the court will rarely be brought unless a change in circumstances has occurred which the petitioner believes will affect the "best-interests" inquiry. Consequently, the fact that circumstances have not changed significantly would, in the ordinary case, be grounds for a court to find no cause to disturb its earlier best-interests determination. This does not mean, however, that a finding that circumstances have changed is a necessary prerequisite to the court's exercise of its authority to modify the dispositional order or that the sufficiency of that finding is subject to review. In all cases, it is the health, safety and interests of the minor which remains the guiding principle when issuing an order of disposition regarding the custody and guardianship of a minor ward. The best interests of the child is the paramount consideration to which no other takes precedence. See *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991), quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991).

Similarly, we find no support for Fontaine's and DCFS's claim that, when DCFS has been named the custodial guardian of a minor child, guardianship may not be terminated unless the court first finds that DCFS

has failed to fulfill its duties under the Act. The cases cited by them for this proposition, *In re K.C.*, 325 Ill. App. 3d 771 (2001), and *In re F.B.*, 206 Ill. App. 3d 140, 156 (1990), are inapposite.

In *In re K.C.*, six children were removed from the custody of their parents and, after being adjudicated abused and neglected, placed in the care and custody of DCFS. A permanency hearing was set by the court to take place two months later, but never occurred. Thereafter, the caseworkers assigned to the matter ignored numerous orders of the court compelling them to complete an administrative review and to provide the court and the parties with copies of the case plan. When a permanency review hearing finally took place in July 1998, the caseworkers' testimony showed that necessary services were not being provided and DCFS's statutory obligations were not being met. As a result, the circuit court directed DCFS to remove the team of caseworkers it had assigned to the case and ordered DCFS to assign a new team of caseworkers to the matter. On appeal, DCFS argued that the circuit court's order should be reversed because the court lacked authority under the Juvenile Court Act to order DCFS to remove and replace caseworkers. Deciding this issue, the reviewing court held:

"[W]here DCFS fails to satisfy its statutory obligation to report, three potential remedies exist: removal of the guardian and the appointment of another (705 ILCS 405/2—28(1) (West 1996)), a *mandamus* action to compel the performance (705 ILCS 405/2—28(2) (West 1996)), and the initiation of contempt proceedings (325 ILCS 5/8.3 (West 1996)). Before a guardian may be removed or a public agency compelled to perform its duty, however, the court first must be satisfied by *proof* that the guardian has not performed its duty." (Emphasis in original.) *In re K.C.*, 325 Ill. App. 3d at 778.

Concluding that DCFS could have been removed because of its failure to fulfill its statutory obligations, the reviewing court held that the circuit court acted

within its statutory authority by requiring DCFS to replace the assigned caseworkers.

In *In re F.B.*, DCFS appealed a contempt order that the juvenile court had issued after DCFS had failed to complete a report sought in connection with a *mandamus* motion brought by the public guardian of Cook County. On review, the court stated:

"The purpose of section 2—28 is to enable the court, which has the ultimate responsibility for the children under its jurisdiction, to be apprised of the treatment accorded the children by their guardians. The Act provides that the court may require the guardian to report 'periodically.' " *In re F.B.*, 206 Ill. App. 3d at 155.

The court then concluded:

"Under the Act, therefore, the court, *after receiving a report,* may retain or relieve the guardian, or it may compel a public agency to perform its official duty. In our judgment, it is implicit in the Act that a guardian may not be removed or a public agency compelled to perform an official duty unless the court is first satisfied by *proof* that the guardian has not performed its duty." (Emphases in original.) *In re F.B.*, 206 Ill. App. 3d at 156.

We interpret these cases to stand for the simple proposition that, before the failure to perform statutory duties can form the basis for the removal of DCFS as guardian or be grounds for compelling DCFS to perform its statutory duty, there must be proof that DCFS has not, in fact, fulfilled its statutory obligations.

In the case at bar the GAL did not ask the court to compel DCFS to fulfill its statutory duty, nor did the GAL seek the removal of DCFS as Austin's guardian because DCFS had failed to fulfill its reporting duties or other statutorily required obligations. Rather, the basis for the GAL's motion was the assertion that Austin's welfare would be better served if a change in custody was made and Austin was placed in the care and custody of the maternal grandparents, the Wards. As a consequence, the court, by deciding that a change in custody

was warranted, exercised its statutory authority to determine the dispositional order which would be in Austin's best interests. Our review of this determination does not require us to consider, as a separate matter, whether a sufficient change in circumstances was proven or whether DCFS was remiss in its duty. The only question when reviewing the court's decision to change custody is whether it is against the manifest weight of the evidence.

### Manifest Weight of the Evidence

The second issue raised by Fontaine and DCFS is whether it was against the manifest weight of the evidence for the circuit court to have removed Austin from the custody and guardianship of DCFS and to have placed him in the custody and guardianship of the Wards. Before addressing this issue, we consider the standards by which we review a determination of this sort.

In all guardianship and custody cases, "the issue that singly must be decided is the best interest of the child." *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991). As the *Ashley K.* court aptly noted:

"A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors ***." *In re Ashley K.*, 212 Ill. App. 3d at 879.

Recognizing that a best-interests determination is often a difficult one, the legislature has identified various factors that help inform the decision. These factors are contained in section 1—3(4.05) of the Juvenile Court Act (705 ILCS 405/1—3(4.05) (West 2000)), which provides:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:
(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

Other important considerations when deciding a child's best interests are "the nature and length of the child's relationship with the present caretaker" and the effect that a change of placement would have upon the emotional and psychological well-being of the child. *In re Violetta B.*, 210 Ill. App. 3d at 534.

While all of the above-cited factors must be considered, no factor is dispositive. Courts must remain ever mindful that "the overriding purpose of the Act to which all other goals are subordinate is the best interest of the child involved." *In re J.L.*, 308 Ill. App. 3d 859, 865 (1999), citing *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994). Even the superior right of a natural parent must yield unless it is in accord with the best interests of the child. See *People ex rel. Edwards v. Livingston*, 42 Ill. 2d 201 (1969); *In re A.H.*, 215 Ill. App. 3d 522 (1991); *In re*

*Violetta B.*, 210 Ill. App. 3d at 533. Under certain circumstances "it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent." *People ex rel. Edwards v. Livingston*, 42 Ill. 2d at 209. That being so, it follows that a close relative need not be shown to be unfit if it is in the best interests of the child that the child be placed in the custody of someone other than the relative. *In re Violetta B.*, 210 Ill. App. 3d at 533 ("if the best interest of the child conflicts with the statutory preference for placement with a close relative, the best interest of the child should control the placement decision").

When a court is called upon to decide a proper disposition for one of its wards, the court may consider all helpful evidence, even if that evidence would not have been competent for purposes of the adjudicatory hearing, and may rely on such evidence to the extent of its probative value. See *In re Perez*, 173 Ill. App. 3d 922 (1988). As to the standard of proof, this court recently held in *In re D.T.*, 212 Ill. 2d 347, 366 (2004), that the proper standard of proof applicable during the best-interests portion of a proceeding to terminate parental rights is the preponderance of the evidence standard. In the case at bar, the matter before the court was not termination of parental rights but, rather, modification of a dispositional order regarding custody and guardianship. Nevertheless, the same best-interests inquiry is required. Therefore, we believe that here, too, the burden of proof must be the preponderance of the evidence. Thus, it was incumbent upon the GAL to show, and the trial court to find, by a preponderance of the evidence that placing Austin in the custody and guardianship of his grandparents was in Austin's best interests. The best-interests determination is then reviewed under the "manifest weight of the

evidence" standard. *In re D.T.*, 212 Ill. 2d 347 (2004); see *In re Tiffany M.*, 353 Ill. App. 3d 883 (2004). This is the standard which this court has always employed, in practice. See *In re A.H.*, 195 Ill. 2d 408, 425 (2001) (wherein the court states that a best-interests determination "will not be disturbed on appeal absent an abuse of discretion or where the judgment is against the manifest weight of the evidence," but reviews the evidence to determine whether the judgment was against the manifest weight of the evidence); *In re Custody of Sussenbach*, 108 Ill. 2d 489, 499 (1985) ("It is not for a reviewing court to try the case *de novo* but merely to determine whether the trial court's transfer of custody constituted an abuse of discretion. In other words, the question for the reviewing court is whether the trial court's decision is contrary to the manifest weight of the evidence"). See also *In re P.P.*, 261 Ill. App. 3d 598, 605 (1994) (the court's determination shall not be reversed unless it is against the manifest weight of the evidence); *In re S.M.*, 223 Ill. App. 3d at 547 ("the trial court's exercise of that discretion will not be reversed unless it is against the manifest weight of the evidence").

The question before us, then, is whether the Madison County circuit court's judgment regarding the best interests of Austin is supported by the manifest weight of the evidence. We find that it is not. Key to this determination is our finding that the Madison County circuit court erred when, in reaching its best-interests determination, it relied almost exclusively upon its own finding that the Wards did not abuse Austin—a finding which it had no authority to make.

In the case at bar, Timothy Berkley, Austin's guardian *ad litem*, filed a motion in the Madison County circuit court seeking to modify the court's January 12, 2000, dispositional order. The GAL asked that Austin be removed from the custody of DCFS and placed in the

custody of his maternal grandfather, William Ward. DCFS and Fontaine opposed the motion, arguing that it would not be in Austin's best interests to be placed in the custody of the Wards because they were the subjects of an "indicated" report of abuse involving Austin. DCFS informed the court that Austin had been placed in relative foster care with the Wards in August 1999, but was removed in March 2000, when Austin was nine months old, because it was discovered that he had suffered a skull fracture. Subsequent examination revealed that Austin also had a healing leg fracture. The Wards had no explanation for how these injuries occurred, despite the fact that, at least with regard to the skull fracture, it was undisputed that Austin sustained the injury while he was in the Wards' sole and exclusive care.

DCFS "indicated" the report of abuse against the Wards in light of all of the evidence, which included the nature of the injuries; the medical reports by Austin's treating physicians; the fact that, at the time Austin's injuries occurred, Wendy Ward had been taking prescribed antidepressant medication; and the fact that the Wards admitted using corporal punishment to discipline nine-month-old Austin and his three-year-old and five-year-old sisters, even though, as foster parents, they were prohibited from doing so. On appeal, an ALJ reviewed DCFS's decision and, based on the testimony of several witnesses, including medical experts, ruled that a preponderance of the evidence supported the finding of abuse against the Wards. The Director of DCFS adopted the ALJ's opinion.

Heather Kocisko, a Central Baptist caseworker who, at the time, was assigned to Austin's case, supported the motion to change custody. Kocisko prepared a "best-interests" report, which she presented to the Madison County circuit court. In this three-page report, Kocisko expressed her belief that the Wards should be awarded

custody of Austin and be allowed to adopt him. This recommendation was based, almost exclusively, upon a repudiation of the ALJ's findings and her personal belief that the Wards had not abused Austin, even though she had no personal knowledge about the Wards' treatment of Austin at the time fractures were discovered because she had not been working with the Wards at that time.

The Madison County circuit court, after hearing all of the testimony, including statements by the Wards and Fontaine, and after reviewing transcripts of the expert medical testimony heard by the ALJ, issued a written decision. The court ruled that it was in Austin's best interests to remove DCFS as his custodial guardian and to place him in the custody of the Wards. In reaching this determination, however, the court ruled, without citation to authority, that it was "not bound" by the findings of the ALJ or the ruling of the Director.[2] The circuit court further held that it did not consider the ALJ's opinion or the Director's final determination as substantive evidence or afford these determinations any probative value. Moreover, the Madison County circuit court conducted what amounted to a collateral review of the indicated finding against the Wards. Citing to the transcripts of the expert medical testimony that were presented to the ALJ, the Madison County circuit court reached conclusions about the credibility of these witnesses that was directly opposite to the credibility determinations of the ALJ, who had the benefit of hearing and seeing the witnesses testify. The Madison County circuit court also concluded, contrary to the ALJ, that the evidence did not support a finding by the preponder-

---

[2]On review, the appellate court affirmed the circuit court's determination, finding that it was not against the manifest weight of the evidence. In doing so, the appellate court repeated, without explanation or citation to authority, that the circuit court was "not bound" by the ALJ's decision.

ance of the evidence that the Wards had abused Austin. In other words, the Madison County circuit court substituted its own findings and conclusions for the ALJ's findings and the Director's final ruling. We hold this was error.

When a circuit court must decide whether a change in custody is in a child's best interests, the circuit court is "not bound" by an administrative determination of abuse, but only in the sense that the administrative determination does not preclude the circuit court from finding that the best interests of the child may be served by returning the child to the custody of the person found to have abused him in the past. To say that a court is "not bound" by the administrative determination does not mean, however, that the court is free to wholly ignore the ruling, afford it no probative value, or substitute its own findings on the matter after conducting a *de novo* review of the evidence.

Review of an administrative agency's decision, such as the ALJ's determination here, is available in accordance with the Administrative Review Law. 325 ILCS 5/7.16 (West 2000). The Administrative Review Law provides in section 3—102, "Article III of this Act shall apply to and govern every action to review judicially a final decision of any administrative agency where the Act creating or conferring power on such agency, by express reference, adopts the provisions of Article III of this Act or its predecessor, the Administrative Review Act. *** *In all such cases, any other statutory, equitable or common law mode of review of decisions of administrative agencies heretofore available shall not hereafter be employed.*" (Emphasis added.) 735 ILCS 5/3—102 (West 2000).

In the case at bar, the Wards did not ask the Madison County circuit court to review the ALJ's determination. Rather, the Wards sought judicial review of the ALJ's

ruling in Will County.[3] Consequently, the Madison County circuit court had no authority to review the ALJ's determination. 735 ILCS 5/3—104 (West 2000) (the court first acquiring jurisdiction of any action to review a final administrative decision shall have and retain jurisdiction of the action until final disposition of the action).

The Madison County circuit court acknowledged that it had no authority to review the ALJ's decision, stating in its written order, "This court notes that it is not in the position to administratively review the decision of DCFS and the Administrative Law Judge under the Illinois Administrative Review Act, 735 ILCS 5/3—101 *et seq.*, and, of course does not do so." Despite this assertion to the contrary, the circuit court's written order makes clear that it did, in fact, review the decision.

Furthermore, even if the Madison County circuit court had been in a position to review the ALJ's decision, it did not do so properly. As this court noted in *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264 (2004), judicial review of an administrative agency decision is limited. Courts may not consider evidence outside of the record of the administrative appeal, reweigh the evidence to determine where the preponderance lies, or evaluate the credibility of the witnesses. 735 ILCS 5/3—110 (West 2002). An administrative agency's findings of fact are not to be reversed unless they are against the manifest weight of the evidence. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). Thus, the Madison County circuit court clearly erred when it reassessed the credibility of the witnesses who appeared before the ALJ and substituted its

---

[3]In an order issued July 28, 2003, the Will County circuit court upheld the ALJ's decision, finding that it was not against the manifest weight of the evidence, contrary to law or in violation of the plaintiffs' due process rights. That determination has not been appealed by the Wards.

own determination regarding the indicated report against the Wards for that of the ALJ.

We recognize that the Madison County circuit court, when considering what placement would be in Austin's best interests, unquestionably had a duty to determine the suitability of the Wards to parent Austin. Part of the equation when assessing the Wards' suitability should have been the existence of an indicated report of abuse against them. The Madison County circuit court did not do this. Moreover, the court considered all of the best-interests factors set forth in section 1—3(4.05) of the Juvenile Court Act in light of its finding that the Wards did not abuse Austin and that the findings by the ALJ and the Director were in error. Under these circumstances, we are compelled to find that the Madison County circuit court's determination as to the best interests of Austin was against the manifest weight of the evidence.

We further note that the circuit court's written order shows that the court's skewed focus on whether the Wards had abused Austin prevented it from properly considering whether the circumstances *as they existed at the time of the hearing* favored giving custody of Austin to the Wards.

Evidence before the court showed that, at the time the motion for a change of custody was brought in March 2002, Austin had been living with Fontaine for almost two years. Nearly two thirds of his life had been spent with Fontaine. Because of the attachments that had formed, Fontaine wanted to adopt Austin and in an adoption action, her application, by law, would be given preference and first consideration. 750 ILCS 50/15.1 (West 2000). Further, as noted earlier in this opinion, once the parental rights of Austin's mother and father were terminated in May 2001, adoption by Fontaine was the permanency goal selected for Austin by DCFS in June

2001, and approved by the court. The circuit court, however, made no mention of these facts in its best-interests determination.

When reviewing the best-interests factors, the circuit court found that Austin was bonded with the Wards and, though placement with them would be disruptive, he would "quickly adjust." We believe that this finding, which was not based on any expert testimony, failed to take into consideration the fact that the Wards' contact with Austin over the two years since his placement with Fontaine had been very limited. Although Austin had regular visitation with the Wards, they were *supervised* visitations, intended primarily to maintain contact between Austin and his siblings. Visits took place every other week for about two hours. There was no evidence that Austin ever had a single unsupervised or overnight visit with the Wards since his removal from their home.

Furthermore, Fontaine testified that Austin called Wendy Ward the "mean lady" and displayed regressive and destructive behavior after visits with the Wards. His behavioral problems prompted Fontaine to seek out professional help and, thus, since December 2000, Austin had been seeing a behavioral specialist, whom Fontaine had obtained through Easter Seals. However, neither Kocisko's "best-interests" report, nor any other document submitted to the court, contained anything about this specialist's assessment of Austin or a report of his progress over the time of his treatment.

The record does contain a "Motion to Supplement the Record," submitted by DCFS to the Madison County circuit court on April 23, 2002. According to this motion, Austin was seen in April 2002 by the Child Study Center for a developmental assessment and physical examination. Attached to the motion was a report prepared by Constance Blade, a pediatrician, and Cheryl Mroz, a developmental psychologist. According to this report,

Austin's head circumference was "outside the normal range for children of his chronological age," and Austin had an "asymmetrical red reflex" indicating a possible retinal (eye) problem that could lead to blindness. It was suggested that Austin be evaluated by an ophthalmologist. The developmental assessment indicated impairment to his auditory memory, visual processing, and olfactory processing. The report noted that "all of these findings can be related to the previous head injury" and suggested a neurological follow-up be done. It was also noted that Austin had sleep and behavioral problems that were exacerbated by changes in his schedule and environment. There was no testimony at the hearing regarding this report.

During Fontaine's testimony, she was asked about a recent assessment of Austin. The GAL objected to the line of questioning, arguing that Fontaine should not be allowed to testify about a "bonding assessment" that had been done for the purposes of the hearing. The circuit court sustained the objection. It is unclear whether it was the Child Study Center report that the GAL objected to and the circuit court excluded. However, when deciding whether a change in custody would be in Austin's best interests, the court made no mention of this report.

## CONCLUSION

We find that the Madison County circuit court committed serious errors when ruling on the motion to change custody. The court, without authority, rejected an administrative finding that the Wards abused Austin after conducting a *de novo* review of the matter. In addition, we find that the circuit court failed to give due consideration to matters important to the best-interests determination. For these reasons, we find that the circuit court's determination that a change of custody was in Austin's best interests was against the manifest weight

of the evidence. We reverse that holding and reinstate DCFS as the custodial guardian with authority to consent to Austin's adoption.

The judgments of the circuit and appellate courts are reversed.

*Reversed.*

JUSTICE KARMEIER took no part in the consideration or decision of this case.