NOTICE
Decision filed 02/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 241087-U

NOS. 5-24-1087, 5-24-1088 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* CHARLIE V. and CALVIN V., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-9, 23-JA-10 |
| | ) | |
| Joyce V., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of the circuit court terminating the respondent's parental rights where the circuit court's findings that the respondent was an unfit person, and it was in the minor children's best interest to terminate the respondent's parental rights, were not contrary to the manifest weight of the evidence.

¶ 2    The respondent, Joyce V.,[1] appeals the September 6, 2024, order of the circuit court of Bond County terminating her parental rights with regard to Charlie V. and Calvin V. (minor children). On appeal, the respondent challenges the circuit court's findings that she is an unfit

_____

[1]Joyce V. was divorced prior to the final hearing in this matter and returned to her prior surname. To avoid any unnecessary confusion, this court will continue to refer to the respondent as Joyce V.

1

person, and that the termination of her parental rights was in the minor children's best interests. For the following reasons, we affirm the judgment of the circuit court.[2]

¶ 3                                   I. BACKGROUND

¶ 4        The respondent and father were married and residing together when, in October 2022,[3] the Department of Children and Family Services (DCFS) initiated an intact case due to the severe neglect of the minor children.[4] During the course of the intact case, it was disclosed that the respondent was having a relationship with an individual named John M., who had previously been convicted for domestic assault against his former wife and sexual assault against a minor. It was also disclosed that the respondent had allowed the minor children to be around John and it was reported that John "likes to get drunk, handsy" and had made comments such as "I can't wait to get my hands on you, I'm going to bust your a**" to the respondent's children.[5]

¶ 5        DCFS deemed the intact case a failure, and on March 2, 2023, the State filed a petition for adjudication of wardship. The petition alleged that the minor children were neglected because they were in an environment injurious to their welfare based on (1) the respondent's inability or unwillingness to protect the minor children (705 ILCS 405/2-3(1)(b) (West 2022)) and (2) not receiving the proper or necessary medical care where the respondent failed to follow through on medical treatment for the minor children's sibling (*id.* § 2-3(1)(a)). The petition also alleged that

---

[2]The cases in the circuit court also involved the minor children's father, Charles V., who separately appealed the circuit court's judgment, which was docketed as Nos. 5-24-1085 and 5-24-1086. As such, we will only include information regarding Charles V. that is relevant and necessary to the arguments raised in this appeal.

[3]The record is unclear on the exact date that the DCFS's intact case was initiated.

[4]The initial report indicated that, among other allegations, the minor children were "covered in bites," and did not receive regular diaper changes to the point that their "butts were so raw, bleeding, and raised up" that they had to be taken to an emergency room.

[5]Respondent has a total of five children. None of respondent's other children are involved in this appeal.

the minor children were abused where they were at a substantial risk of emotional impairment based on the respondent being unable or unwilling to make viable parenting decisions (*id.* § 2-3(2)(ii)). The petition did not contain any allegations against father. Protective custody of the minor children was taken on April 10, 2023.

¶ 6 The circuit court entered a shelter care order on April 10, 2023, finding that the minor children were abused and neglected and that it was a matter of urgent and immediate necessity for the safety and protection of the minor children that they be placed in shelter care. The circuit court entered a written order on June 30, 2023, adjudicating the minor children as neglected based upon the parties' stipulation that the minor children were in an environment that was injurious to their welfare (*id.* § 2-3(1)(b)).[6] The circuit court found that the neglect was inflicted by a parent, specifically, the respondent. On August 18, 2023, the circuit court entered a dispositional order finding that the respondent was unfit and unwilling, and father was unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor children "based upon mental health concerns, etc.," and that it was consistent with the health, welfare, safety, and in the best interest of the minor children, to be made wards of the court. As such, the minor children were made wards of the court, and custody and guardianship of the minor children was placed with the guardianship administrator of DCFS.

¶ 7 DCFS filed a family service plan on May 31, 2023. The service plan required the respondent to participate in the following services: (1) complete a mental health assessment and follow through with all recommendations; (2) not discontinue any service without the consent of DCFS; (3) complete and sign all necessary release of information; (4) complete a substance use

---

[6]The record on appeal does not contain a transcript regarding the adjudication hearing. The only transcript contained in the report of proceedings is the circuit court's fitness and best interest hearing conducted on September 6, 2024.

assessment and follow through with any recommendations; (5) remain free of alcohol and substance use; (6) submit to random drug and alcohol testing; (7) complete parenting instruction; (8) engage in visitation and display minimal parenting skills during visits; (9) provide safe, stable, and clean housing; (10) maintain employment; and (11) inform DCFS of all changes in address, telephone number, employment, and household members.

¶ 8    The DCFS report filed on March 13, 2024, stated that in February 2024, the respondent had "sent messages to family stating she was going to kill herself," and that this incident occurred after the respondent found out that John had a heart attack and was in the hospital. The report stated that the respondent admitted that she visited John while he was in the hospital. On March 1, 2024, John was arrested at the respondent's father's home for two counts of predatory child sexual abuse, not involving the minor children, and possession of methamphetamine. His parole was revoked, and John was incarcerated. The report stated that the respondent admitted that she had spoken with John while he was incarcerated. The report further noted that the respondent "shared that at the last court date the judge was very clear about her having no contact with John" and that the respondent's contact with John after the respondent's appearance at the circuit court on January 5, 2024, "clearly is a disregard to the judge and court."

¶ 9    The report went on to state that the respondent had been compliant with random drug testing and all testing had been negative. The report stated that the respondent had completed a parenting class; a parenting capacity assessment; attended visitation and was reported to do well with the minor children; was residing with her father; and attending marriage counseling. The report further stated that the respondent was engaged in mental health counseling, but that her counselor had reported that the respondent lacked insight to the severity of her case with DCFS and that there were concerns with the respondent's mental health due to the respondent's remarks

4

about killing herself. The report stated that the respondent was referred for a psychological evaluation and that the evaluation was awaiting scheduling.

¶ 10    The family service plan filed by DCFS on April 9, 2024, stated that the respondent had completed her mental health assessment but that the respondent had not been honest regarding her ongoing relationship with John in her subsequent counseling. As such, the plan stated that the respondent had unsatisfactory progress on this service. The respondent was also unsatisfactory in notifying DCFS of changes in household members. The plan stated that, during the past six months, the respondent had not kept her caseworker updated concerning where the respondent was living and "[a]t this point it is still unclear" where the respondent was residing.

¶ 11    The plan further indicated that the respondent was making satisfactory progress in her visitation with the minor children and in displaying appropriate parenting skills during visitations. The plan went on to state that the respondent was making satisfactory progress in her marriage counseling, but unsatisfactory progress in abstaining from relationships with anyone who could pose a safety threat to her children since the respondent continued her relationship and/or contact with John.

¶ 12    On April 10, 2024, the State filed a motion for termination of parental rights. The motion alleged that the respondent was an unfit person for failing to make reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2022)), and/or reasonable progress (*id.* § 1(D)(m)(ii)), towards the return of the minor children within the first nine months after the adjudication of neglect, specifically, from June 30, 2023, until March 30, 2024. The circuit court held a hearing on the State's motion for termination on September 6, 2024.

5

¶ 13    At the beginning of the hearing, the State requested that the circuit court take judicial notice of, *inter alia*, the circuit court's docket entry of January 5, 2024. That docket entry stated as follows:

> "Matters comes on for hearing. Mother confesses she is still in a relationship with a registered sex offender. After hearing evidence, the Court does find her testimony incredible. She is advised to make a choice either stay with the sex offender or try to get her children back. This matter is coming up on nine months since adjudication. Court will make a decision at the next court date as to whether or not the goal should be changed. Parents are in an on again/off again relationship. Divorce has been filed but then is dismissed. Parents are advised they need to make decisions with their lives and decide how things are going to move forward."

¶ 14    The circuit court took judicial notice of the above entry and then the State called Erin Schaub to testify. Schaub stated that she was employed with DCFS as a placement supervisor and had overseen the case since the minor children came into protective custody in April 2023. Schaub stated that the concerns related to the medical and environmental neglect allegations had been mitigated during the intact case, but that the minor children had come into care due to the respondent's relationship with John. Schaub stated that the respondent's relationship with John was a concern since John had previous criminal charges, DCFS indicated allegations regarding child abuse, and was a registered violent offender towards children. Schaub testified that DCFS cannot dictate what relationship the respondent could be in, but on multiple occasions discussed with the respondent the concerns a continued relationship with John posed to the minor children.

¶ 15    Schaub stated that the respondent had been required to complete a parenting capacity assessment because she had engaged in some of the recommended services but was simply

6

"checking boxes" and not translating it to any actual changes in her day-to-day life or insight into the safety concerns that brought the minor children into care. The parenting capacity assessment stated that the respondent did not meet minimum parenting requirements based on the respondent's judgment regarding her relationships and her failure to acknowledge any safety concerns related to those relationships. Schaub testified that the respondent was admonished by the circuit court regarding her relationship with John, and yet the respondent continued her contact with John throughout the nine-month period of June 30, 2023, to March 30, 2024.

¶ 16    Schaub went on to state that the respondent was compliant on substance use, had completed her parenting classes, and was attending marriage counseling. Schaub stated that the respondent had attended her mental health counseling, but did not achieve any progress since she continued her relationship with John despite the fact that the relationship was the reason the minor children were in care. In addition to her relationship with John, Schaub stated that during the relevant time, she believed that the respondent made two different suicide attempts and that the respondent had not been open and honest during her mental health counseling sessions.

¶ 17    Schaub also testified that, during the relevant time period, John was investigated by DCFS for allegations of sexual penetration, sexual molestation, and substantial risk of sexual abuse. Since the respondent had her children around John during this time, Schaub stated that the respondent was also indicated for substantial risk of sexual abuse. Schaub testified that the minor children were not the subject of the investigation, however, they were indicated victims for risk only. Although John was now incarcerated, Schaub stated that, in her opinion, it did not eliminate the problem of the respondent's relationship with John since the respondent continued her contact with John and never acknowledged the danger that John posed to her children. Schaub testified that it was her opinion that the respondent had not made reasonable efforts or reasonable progress

7

because she failed to show any insight or understanding about the safety concerns that brought the minor children into care.

¶ 18    Next, the respondent was called and testified on her own behalf. The respondent stated that she and father had divorced in June 2024. The respondent testified that she "knew less" about John's criminal history before she started dating him. She stated that she knew he had gotten into trouble, but did not know what that trouble was until October 2022. Once she became aware of the nature of John's offenses, the respondent stated that she began to inquire into John's background and "found out that he was a registered sex offender for 20 years which I thought he just got in trouble for a sexual assault. *** [T]hen I found out later on it was a domestic on a child."

¶ 19    The respondent testified that she had dated John's brother when she was younger and knew John from being around his family. The respondent stated that there was no contact with John for probably 18 years, and then they "just started talking to touch base on how each other was doing and stuff like that." The respondent stated that she never intended to leave father and move in with John. The respondent testified that she and father already had problems in their marriage and that she had planned on taking the minor children and moving in with her father until she could get a better job to provide for the minor children.

¶ 20    The respondent stated that she currently resides with her father and, as such, has stable housing. She stated that she was currently employed with a tree and lawn care service and worked 20-30 hours weekly, depending on the weather. The respondent testified that she no longer has a relationship with John and that she does not continue to talk with him. She did, however, recently visit John in jail so she could talk with him about the recent DCFS allegations since she was also indicated and wanted to "see what information I could get out of him to help me."

8

¶ 21    If John was released that day, the respondent stated she would not have a relationship with him because she would put her children over John. The respondent stated that the reason she had not done that before was that "[n]o one ever told me to get rid of him" and "never did anybody look me in the face and say he is the reason; get rid of him or you lose your children." On cross-examination, the respondent admitted to appearing in the circuit court on January 5, 2024, and hearing the judge's admonishment about her relationship with John. The respondent then testified as follows:

"Q. So how can you sit here today and say nobody told you that John [M.] was the problem? Because the judge told you he was a problem, didn't he?

A. Yes.

Q. And after that admonishment, you failed to follow the Court's order. You continued to have communication with John, didn't you?

A. Yes.

* * *

Q. And additionally even though you just testified that you aren't in contact with John anymore, you then said that you went to go visit him. So you have had continued contact with John since he's been back in prison, correct?

A. Correct.

* * *

Q. And it's your testimony today you knew that he was at least at one point a registered sex offender at some time, right?

A. Yes.

9

Q. And you knew that the domestic case that he has, the victim was a child. You knew that, right?

A. Not until after I looked into it in October when DCFS stepped in."

¶ 22 After the respondent's testimony, father was called and testified that he and the respondent were divorced on June 17, 2024. Father stated that the reason he had not followed through on the previous divorce proceedings was that the respondent would indicate that her relationship with John was over, and father had hoped to keep the family together. The father stated that the reason he finally followed through with the divorce was "[a]fter having more contact, after told not to, just ain't looking like it's possible to keep the family together. I had no other choice but to get divorced."

¶ 23 Upon completion of the testimony, and after hearing arguments, the circuit court found as follows:

"Okay. First off, the Court has had an opportunity to—or the Court is familiar with this case. Because these parties have been in front of the judge before and at shelter care and also at adjudication, the parents are always admonished that they need to make reasonable efforts and reasonable progress as to each service on their service plan. And it is explained to the parents that reasonable efforts mean that if they want you to take a class or do some sort of counseling, that you actually show up and do it. And it is also explained that reasonable progress means that if you go to these classes or counseling sessions, that you actually participate and learn something and apply it to your life. You don't just show up to go through the motions and check off the boxes.

Now, the Court has had an opportunity to hear the evidence today and judge the credibility of the witnesses. And based upon that, the Court finds that the State has proved

10

by clear and convincing evidence that the respondent Joyce [V.] is an unfit person to have these children for the following reasons: One, she has failed to make reasonable efforts toward the return of the minors to the parents during the nine month period of June 30th, 2023 through March 30th, 2024. And that she has also failed to make reasonable progress towards the return of the children to the parent during the nine month period of June 30th, 2023 through March 30th, 2024."

¶ 24    The circuit court then proceeded to a best interest hearing. The circuit court took judicial notice of the facts presented in the fitness portion of the hearing, along with the entire case file and the prior sworn testimony of Schaub. The State then recalled Schaub to testify concerning the minor children's best interests. Schaub stated that the minor children had been placed in a fictive kin[7] foster home since February 2024, and that the home was clean and safe. Schaub stated that the minor children had their own bedroom, age-appropriate toys, and appear very comfortable and content in the home. Schaub testified that the foster parents were very loving, caring, and supportive, and that the minor children appear integrated into the family.

¶ 25    Schaub further testified that both minor children received early intervention services and that the foster parents had supported those services. Schaub also stated that the foster father was employed; the foster mother was a stay-at-home parent; the home meets minimum DCFS requirements; and, that the foster parents have signed permanency commitments indicating their willingness to adopt the minor children. It was Schaub's opinion that the minor children were adjusted, happy, and healthy in the current placement and that it would be in the best interests of the minor children that the respondent's parental rights be terminated.

---

[7]A fictive kin relationship is one that a child has with an individual who is not related by birth, adoption, or marriage to a child, but who has an emotionally significant relationship with the child. See 225 ILCS 10/2.17 (West 2022).

¶ 26    The minor children's guardian *ad litem* (GAL) also opined to the circuit court that it would be in the minor children's best interest to terminate the respondent's parental rights. The GAL stated that minor children had good foster parents that were willing, able, and capable of providing permanency to the minor children, and that it was in the best interest of the minor children to have some sort of permanency. Neither the respondent nor father testified or presented any evidence at the best interest portion of the hearing.

¶ 27    The circuit court then stated that it had considered the statutory factors regarding a best interest determination and found that the State had proven by a preponderance of the evidence that it was in the best interest and welfare of the minor children that the respondent's parental rights be terminated. As such, the circuit court ordered the termination of the respondent's parental rights with regard to the minor children and the respondent timely appealed.

¶ 28                                  II. ANALYSIS

¶ 29    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022).

¶ 30    The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings

12

appear to be unreasonable, arbitrary, or not based on the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 31 The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 32 If the circuit court finds a parent to be unfit, the cause proceeds for the circuit court to determine whether it is in the best interests of the child for the parent's rights to be terminated. 705 ILCS 405/2-29(2) (West 2022); *In re M.J.*, 314 Ill. App. 3d at 655. At this stage of the proceedings, the focus of the circuit court shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "[T]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. A finding that termination is in the child's best interests will not be reversed unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1115-16 (2002). As previously stated, a finding is contrary to the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re M.J.*, 314 Ill. App. 3d at 655.

¶ 33 When determining the child's best interests, the circuit court is required to consider, in the context of the child's age and developmental needs, the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 34 "While all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005), *overruled on other grounds by In re M.M.*, 2016 IL 119932, ¶ 28. Other important factors include the effect that a change of placement would have upon the

14

emotional and psychological well-being of the child and the nature and length of the child's relationship with the present caretaker. *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991). The circuit court is not required to articulate any specific rationale for its decision, and on review, we may affirm the circuit court's decision without relying on any basis used by the circuit court. *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004).

¶ 35 On appeal, the respondent argues that the circuit court erred in finding the respondent unfit and in determining that termination of her parental rights was in the best interest of the minor children. Concerning the circuit court's unfitness finding, the respondent argues that she had made earnest and conscientious strides towards correcting the conditions which led the minor children to be taken into care. The respondent lists the various services that she had completed and argues that the only "negatives on the return of the children" were that the respondent lacked insight as to the severity of her case with DCFS, and concerns regarding her mental health due to her remarks about killing herself. The respondent argues that mental health counseling is not something that can necessarily be completed within the first nine-month period after adjudication and these concerns could be remedied with continue counseling. The respondent also argues that John is now incarcerated and that she had testified that she would not have any future contact with John. As such, the respondent argues that she had made reasonable efforts to correct the conditions that were the basis for the removal of the minor children.

¶ 36 Reasonable effort is a subjective standard that focuses on the amount of effort that is reasonable for the individual whose rights are at stake. *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). Unlike the goal of reasonable progress, reasonable efforts relate to the narrower goal of correcting the conditions that were the basis for the removal of the child from the parent. *Id.* Here, the respondent was informed on numerous occasions by DCFS and the circuit court that the primary

15

obstacle to the return of the minor children to her care was her relationship with John and the safety risk he posed to the minor children. The respondent, by her own admission, disregarded those admonishments and continued to have contact with John throughout the period of June 30, 2023, through March 30, 2024.

¶ 37    We note that the respondent never argued or stated that the termination of her relationship with John was unreasonable, nor did she present any conditions that would hinder her ability to discontinue that relationship. The circuit court heard testimony regarding the numerous times that the respondent was informed that her relationship with John was the reason that the minor children were taken into care and that her continued relationship with John was the reason that the minor children could not be returned to her care. By her own testimony, the respondent acknowledged that she was aware of John's history as of October 2022 yet continued her relationship with John despite that knowledge and in direct opposition to the admonishments of DCFS and the circuit court.

¶ 38    Although the respondent argues that John is incarcerated and that she testified that she does not plan to have any future contact with him, the respondent failed to acknowledge, at any point, that exposure to an individual with John's history was a safety threat to the minor children. As such, even with John being incarcerated, there still remains a valid concern regarding the respondent's judgment and decision making concerning the safety of the minor children, which was the basis that brought the minor children into care. Therefore, we find that the circuit court's finding that the respondent failed to make reasonable efforts, during the period of June 30, 2023, through March 30, 2024, to correct the conditions that were the basis for the removal of the minor children was not unreasonable, arbitrary, or not based on the evidence. As such, we find that the

16

circuit court's finding that the respondent was an unfit person was not contrary to manifest weight of the evidence.

¶ 39    Because each of the statutory grounds of unfitness is independent, and the circuit court's finding may be affirmed as to any one of the alleged grounds, we will not address the respondent's issue with regard to the circuit court's finding of unfitness based on reasonable progress. See *In re C.W.*, 199 Ill. 2d at 217. Instead, we will proceed to the respondent's issue regarding the circuit court's best interest determination.

¶ 40    The respondent does not argue that the circuit court erred as a matter of law in this case, such as, by failing to follow proper procedures, failing to consider the appropriate statutory factors, or that the circuit court abused its discretion by erring in its admission or exclusion of evidence for example. Rather, the respondent argues that testimony and evidence presented to the circuit court established that she loved her children, and she was diligently working to be a better mother to the minor children. As such, the respondent repeats the information that was considered by the circuit court and asks this court to reach a different result.

¶ 41    As explained above, on review, this court will not reweigh the evidence or reassess the credibility of the witnesses. The circuit court was in the best position to make a credibility assessment of the testimony of the respondent's placement supervisor. The State presented evidence that the minor children were in a safe, stable, and loving home that met the needs of the minor children. The circuit court considered the evidence along with the statutory factors related to a best interest determination. We have thoroughly reviewed the record on appeal and do not find that the circuit court's finding that it was in the minor children's best interest to terminate the respondent's parental right was contrary the manifest weight of the evidence.

17

¶ 42                      III. CONCLUSION

¶ 43    Based on the above, we find that the record does not demonstrate that the circuit court's findings that the respondent was unfit and that it was in the minor children's best interests to terminate the respondent's parental rights were against the manifest weight of the evidence. Accordingly, we affirm the judgment of the circuit court terminating the respondent's parental rights.

¶ 44    Affirmed.